UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILAL AHDOM,<br><br>       Plaintiff,<br><br>  vs.<br><br>C. ETCHEBEHERE, et al.,<br><br>       Defendants. | 1:13-cv-01623-DAD-GSA-PC<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT ETCHEBEHERE'S MOTION FOR SUMMARY JUDGMENT BE GRANTED (ECF No. 44.)<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS |

## I.    BACKGROUND

Bilal Ahdom ("Plaintiff") is a state prisoner proceeding pro se with this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff filed the Complaint commencing this action on October 9, 2013.  (ECF No. 1.)  This case now proceeds on Plaintiff's Second Amended Complaint (SAC), filed on December 8, 2015.  (ECF No. 24.)

On January 20, 2017, Defendant filed a motion for summary judgment, or in the alternative, a motion for an order requiring payment of security.  (ECF No. 44.)  On April 12, 2017, Plaintiff filed an opposition to Defendant's motion.[1]  (ECF No. 52.)  On April 19, 2017, Defendant filed a reply to Plaintiff's opposition.  (ECF No. 54.)

---

[1] Concurrently with her motion for summary judgment, Defendant served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 44-4.)

The motion has been submitted upon the record without oral argument pursuant to Local Rule 230(*l*), and for the reasons that follow, Defendant's motion for summary judgment should be granted.

## II. PLAINTIFF'S ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

Plaintiff is currently incarcerated at the California Substance Abuse Treatment Facility (SATF) in Corcoran, California, in the custody of the California Department of Corrections and Rehabilitation (CDCR), where the events at issue in the Second Amended Complaint allegedly occurred. Plaintiff alleges as follows:

Plaintiff is a practicing Muslim and also a vegetarian with an approved vegetarian meal card. During the month of Ramadan, fasting Muslims are required to partake of ceremonial "sacred meals" known as Iftar and Suhoor meals.

On or about July 18, 2012, Plaintiff was sent to the Echo-Yard Chapel for a Ramadan announcement. Plaintiff was informed by a female prison employee (Doe I), by way of a 7/11/12 memo by defendant Associate Warden Etchebehere, that he had to be a participant in the CCR T15 Religious Meat Alternate Program ("RMA") to receive his Ramadan meals. The RMA meal is unofficially and erroneously termed the Halal Meal or Halal Religious Meal by prison officials. Plaintiff alleges that the RMA meal can substitute for the Iftar meal during Ramadan, but not for the Suhoor meal. The Suhoor meal is made up of different food items than the RMA meal, and all of its foods are packaged for Treft (contamination) protections.

Plaintiff asked Doe I why he was required to participate in the RMA program to receive his Iftar and Suhoor meals. Plaintiff told Doe I that he was a vegetarian and asked why he was required to give that up and sign up for the RMA meals. Plaintiff showed Doe I his vegetarian meal card, but Doe I said she was not allowed to make an exception, and Plaintiff could "602" it. Doe I denied Plaintiff's requests to speak directly to defendant Etchebehere or to be added to the Ramadan meal list without signing up for RMA meals. She told Plaintiff that defendant Etchebehere was the only one who authorizes it. Plaintiff asked Doe I for a CDCR 3030-D Religious Diet Request Form (to sign up for the RMA diet), and she told him he could get one from the Chaplain.

On July 19, 2012, the first day of Ramadan, Plaintiff met with Catholic Chaplain Guembe to sign up for the RMA diet. Plaintiff asked Guembe if Guembe could provide him with Ramadan meals or add his name to the Ramadan participation list without Plaintiff signing up for the RMA diet, in that way he would not have to give up his vegetarian diet and could still receive his Iftar and Suhoor meals. Guembe told Plaintiff she was not authorized to do that but would inform her supervisor and ask her to make the requests. Plaintiff filled out the diet request form and handed it, and his vegetarian meal card, to Guembe, who took them with her to the office. When Guembe returned she told Plaintiff she had forwarded everything to Etchebehere, that it was approved, and that he would receive his Ramadan meals that evening. Guembe returned Plaintiff's vegetarian meal card to him and left.

That evening, Plaintiff went to the dining facility for his Iftar and Suhoor meals. The correctional officer told Plaintiff he was not on the Ramadan list. Plaintiff said he had been approved by Guembe earlier in the day; the officer then told Plaintiff to talk to the Sergeant. The Sergeant said custody [staff] has nothing to do with the Ramadan program, and Plaintiff would have to talk to Guembe or Etchebehere tomorrow. Plaintiff told the Sergeant he did not have any food to eat and asked for his meals. The Sergeant said he was not authorized to give Plaintiff the meals unless he was on the Ramadan list.

During the next few days, Plaintiff tried but was unable to contact Guembe or Etchebehere, and each day he was refused Ramadan meals because he was not on the list. By July 21, 2012, Plaintiff developed a headache and was very weak from not eating anything since July 18. Plaintiff continued to look for Guembe without success. By July 23, Plaintiff still had not eaten and was too weak to get out of bed. Plaintiff thought that Guembe must have lied to him about forwarding documents to defendant Etchebehere as well as the approval, but he had no proof. Finally, on July 25, 2012, Plaintiff received his Iftar and Suhoor meals.

Plaintiff filed a prison grievance, and on February 1, 2013, at the third level of review, prison officials decided that defendant Etchebehere's requirement for Plaintiff to be a participant in the RMA meal program to receive Ramadan meals was inappropriate. Plaintiff had suffered pain, weakness, isolation, and humiliation because of the denial of meals. He was

isolated from other fasting Muslims eating their sacred meals and unable to perform ceremonial "Sunnah" rituals.

### III.   PLAINTIFF'S CLAIMS

The SAC named defendants Etchebehere, Guembe, and Does 1-4 for (1) violations of religious rights under the First Amendment, (2) deliberate indifference under the Eighth Amendment, and (3) discrimination under the Fourteenth Amendment.  (ECF No. 24.)  On December 16, 2015, the court dismissed all of the claims against defendants Guembe and Does 1-4, based on Plaintiff's failure to state any claims against them. (ECF No. 25 ¶VI(1).)  As a result, this case now proceeds only against defendant Etchebehere.  On January 26, 2016, the court directed the U.S. Marshal to serve process upon defendant Etchebehere.  (ECF No. 27.)

Based on the following, this case now proceeds only against defendant Etchebehere in her individual capacity on Plaintiff's Free Exercise claim under the First Amendment, for money damages.

#### A.   Claims Against Defendant Etchebehere

##### 1.   RLUIPA and First Amendment Free Exercise Claims

In the December 16, 2015, screening order, the court found that Plaintiff stated a claim against defendant Etchebehere under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") [42 U.S.C. § 2000cc-1].  (ECF No. 25.)  The court later clarified that the court intended in the December 16, 2015, order to permit Plaintiff to proceed against defendant Etchebehere under both RLUIPA and the Free Exercise clause of the First Amendment.  (ECF No. 34 at 3.)  However, on June 10, 2016, the court dismissed the RLUIPA claim with prejudice, for failure to state a claim.  (Id. at 11.)

##### 2.   Eighth and Fourteenth Amendment Claims

It appears that by inadvertent omission, the court also intended in the December 16, 2015, screening order to dismiss Plaintiff's Eighth and Fourteenth Amendment claims against defendant Etchebehere, because in the orde, the court found the SAC appropriate for service only on Plaintiff's religious rights claims.  The court acknowledged that the SAC included claims under the First, Eighth, and Fourteenth Amendments, but in discussing the claims

against defendant Etchebehere, the court only addressed the RLUIPA and Free Exercise claims, concluding that "an answer will be required [for] the claim that Associate Warden Etchebehere violated Plaintiff's rights under [RLUIPA]." (ECF No. 25 at 5-7.) A review of the SAC shows that Plaintiff failed to state claims against defendant Etchebehere for deliberate indifference under the Eighth Amendment, nor equal protection under the Fourteenth Amendment. This is apparent for the reasons that follow. Further, the court finds that the deficiencies in the Eighth and Fourteen Amendment claims outlined below are not capable of being cured by amendment, and therefore amendment would be futile. 28 U.S.C. § 1915(e)(2)(B)(ii); Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000).

### Eighth Amendment – Deliberate Indifference

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995 (1992) (citations and quotations omitted). "An Eighth Amendment claim that a prison official has deprived inmates of humane conditions of confinement must meet two requirements, one objective and the other subjective." Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 2010) cert. denied, 514 U.S. 1065 (1995). First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994). Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). The objective requirement is met if the prison official's acts or omissions deprived a prisoner of "the minimal civilized measure of life's necessities.'" Allen, 48 F.3d at 1087 (quoting Farmer, 511 U.S. at 834 (1994)). To satisfy the subjective prong, a plaintiff must show more than mere inadvertence or negligence. Neither negligence nor gross negligence will constitute deliberate indifference. Farmer at 833, & n. 4; Estelle v. Gamble, 429 U.S. 97, 106 (1976). The Farmer court concluded that "subjective recklessness as

used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause" and adopted this as the test for deliberate indifference under the Eighth Amendment. <u>Farmer</u> at 839-40.

Here, Plaintiff's allegations in the SAC are insufficient to state a claim for deliberate indifference. Plaintiff fails to make factual allegations demonstrating that defendant Etchebehere knew about an excessive risk to Plaintiff's health or safety and then acted or failed to act while consciously disregarding the risk. Plaintiff's speculation that Defendant ignored Plaintiff's enrollment in the RMA and failed to place his name on the Ramadan list is not enough to show deliberate indifference. Therefore, Plaintiff failed to state an Eighth Amendment claim against defendant Etchebehere.

**<u>Fourteenth Amendment – Equal Protection</u>**

The Equal Protection Clause requires that persons who are similarly situated be treated alike. <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985); <u>Shakur v. Schriro</u>, 514 F.3d 878, 891 (9th Cir. 2008). An equal protection claim may be established by showing that Defendants intentionally discriminated against Plaintiff based on his membership in a protected class, <u>Comm. Concerning Cmty. Improvement v. City of Modesto</u>, 583 F.3d 690, 702-03 (9th Cir. 2009); <u>Serrano v. Francis</u>, 345 F.3d 1071,1082 (9th Cir. 2003), <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, <u>Engquist v. Oregon Department of Agr.</u>, 553 U.S. 591, 601-02, 128 S.Ct. 2146 (2008); <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000); <u>Lazy Y Ranch Ltd. v. Behrens</u>, 546 F.3d 580, 592 (9th Cir. 2008); <u>North Pacifica LLC v. City of Pacifica</u>, 526 F.3d 478, 486 (9th Cir. 2008).

Plaintiff did not allege any facts in the SAC demonstrating that he was intentionally discriminated against on the basis of his membership in a protected class, or that he was intentionally treated differently than other similarly situated inmates without a rational relationship to a legitimate state purpose. Therefore, Plaintiff failed to state a claim under the Fourteenth Amendment for violation of his right to equal protection.

### 3.    **Relief Requested**

In the SAC, Plaintiff requested as relief monetary damages, attorney's fees, costs of suit, injunctive relief, and declaratory relief.

Plaintiff is not entitled to attorney's fees if he prevails in this action because he is representing himself in this action.   A plaintiff who is not represented by an attorney is not entitled to recover attorney's fees if he prevails.   See Friedman v. Arizona, 912 F.2d 328, 333 n.2 (9th Cir. 1990), superseded by statute as stated in Warsoldier v. Woodford, 418 F.3d 989 (9th Cir. 2005); Gonzalez v. Kangas, 814 F.2d 1411, 1412 (9th Cir. 1987); see also Rickley v. Cnty. of Los Angeles, 654 F.3d 950, 954 (9th Cir. 2011) ("The Court accordingly adopted a per se rule, categorically precluding an award of attorney's fees under § 1988 to a pro se attorney-plaintiff.")

As for Plaintiff's request for injunctive relief, any award of equitable relief is governed by the Prison Litigation Reform Act, which provides in relevant part:

> "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."   18 U.S.C. § 3626(a)(1)(A).

On June 10, 2016, the court found it "clear that Ahdom is not entitled to injunctive relief." (ECF No. 34 at 6.)  Plaintiff has not requested any particular injunctive relief, and based on the nature of the claims at issue in this action, which involve past conduct, Plaintiff is not entitled to injunctive relief.

Plaintiff's request for declaratory relief should be denied because it is subsumed by Plaintiff's damages claim. See Rhodes v. Robinson, 408 F.3d 559, 565-66 n.8 (9th Cir. 2005) (because claim for damages entails determination of whether officers' alleged conduct violated plaintiff's rights, the separate request for declaratory relief is subsumed by damages action); see also Fitzpatrick v. Gates, No. CV 00-4191-GAF (AJWX), 2001 WL 630534, at *5 (C.D. Cal. Apr. 18, 2001) ("Where a plaintiff seeks damages or relief for an alleged constitutional injury that has already occurred declaratory relief generally is inappropriate[.]")

### 4. **Official Capacity**

Plaintiff sues defendant Etchebehere in her individual and official capacities. "The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials in their official capacities." <u>Aholelei v. Dept. of Public Safety</u>, 488 F.3d 1144, 1147 (9th Cir. 2007) (citations omitted). Without the RLUIPA claim, Plaintiff may not bring a suit against Defendant in her official capacity. However, the Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacities. <u>Hafer v. Melo</u>, 502 U.S. 21, 30 (1991); <u>Porter v. Jones</u>, 319 F.3d 483, 491 (9th Cir. 2003). Defendant Etchebehere was a prison official employed by the CDCR when the events at issue occurred, and therefore is limited to monetary damages as relief. In addition, Plaintiff may not proceed against Defendant in her official capacity.

## IV. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); <u>Washington Mut. Inc. v. U.S.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); accord <u>Simmons v. Navajo Cnty., Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he or she need only prove an absence of evidence to support Plaintiff's case. <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If the defendant meets his or her initial burden, the

burden then shifts to the plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires the plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## V.    UNDISPUTED FACTS

Unless otherwise noted, the following facts are undisputed by the parties based on a thorough review of the record.[2]

1.    During all times relevant to the Second Amended Complaint (SAC), Plaintiff Bilal Ahdom was a Muslim inmate who practiced Islam.  (Decl. A. Whisnand, Ex. A at Whisnand.009-010 [Pl.'s Dep., p. 25:17–26:1]; see also id. at Whisnand.011 [Pl.'s Dep., p. 27:16-17].)[3]

2.    During all times relevant to the SAC, Plaintiff was in the custody of the California Department of Corrections and Rehabilitation (CDCR), and incarcerated at the

---

[2] These facts are taken from Defendant's Separate Statement of Undisputed Facts, ECF No. 44-3, Plaintiff's Statement of Facts, ECF No. 53, and Defendant's Response to Plaintiff's Statement of Facts, ECF No. 56.  The court has considered all declarations, affidavits, and exhibits submitted in support of each statement. Some facts have been altered by the court, as indicated in the court's footnotes.  These facts are undisputed only for purposes of Defendant's motion for summary judgment.

[3] All page numbers cited herein, except those designating pages of Plaintiff's deposition, are those assigned by the court's CM/ECF system and not based on the parties' pagination of their briefing materials.

California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF). (Pl.'s SAC, ECF No. 24 at 1.)

3. From March 12, 2012, until approximately late July or early August 2012, Defendant was employed by CDCR as an Associate Warden at SATF, Complex IV. (Decl. C. Etchebehere, ¶2.)

4. As the Associate Warden of Complex IV, Defendant was responsible for overseeing the religious programs at SATF. (Decl. C. Etchebehere, ¶3.)

5. Typically, a Community Partnership Manager (CPM) would oversee the religious programs at SATF, but because the CPM did not start work until May 2012, the primary responsibility for overseeing religious programs fell to Defendant. Custody staff members, like Defendant, did not typically administer religious programs. (Decl. C. Etchebehere, ¶4.)[4]

6. As the Associate Warden overseeing religious programs in 2012, Defendant was responsible for coordinating the observance of Ramadan during the time period relevant to the SAC. (Decl. C. Etchebehere, ¶5.)

7. Ramadan is an annual, month-long religious fast observed by Muslims. During Ramadan, Muslims fast from dawn to sunset, and only eat food and drink from sunset to sunrise. (Decl. C. Etchebehere, ¶6.)

8. According to Plaintiff's religious beliefs, he is required to fast from sunrise to sunset, pray, read the Quran, and limit conversation during the month of Ramadan. (Decl. A. Whisnand, Ex. A at Whisnand.010-011[Pl.'s Dep., p. 26:19 – 27:15]; see Decl. C. Etchebehere, ¶6.)

9. In 2012, Ramadan was observed at SATF beginning on the evening of July 19, 2012, and ending on August 18, 2012. (Decl. C. Etchebehere, ¶6.)

---

[4] FACT No. 5. Plaintiff disputes this fact, stating that Chaplain Guembe was responsible for placing Plaintiff's name on the weekly list for Islamic services, for special religious events, and for approving religious meal applications. However, Plaintiff has not disputed that Defendant had the *primary* responsibility for overseeing religious programs. The fact that Chaplain Guembe was responsible for *some* religious tasks does not cause a dispute of fact. Therefore, this fact is undisputed.

10. In the years prior to Defendant's assignment as an Associate Warden, Ramadan at SATF followed a basic framework: Inmates who had been verified as Muslims were released to the dining halls after sunset on each night of Ramadan. At the dining halls, the Muslim inmates would receive an evening meal and a sack "breakfast" to eat in their cells before sunrise. (Decl. C. Etchebehere, ¶7.)

11. Inmates not participating in Ramadan remained on the normal feeding schedule and program: these inmates received a hot breakfast in the dining hall, a sack lunch to take back to their cells, and a hot dinner in the dining hall. (Decl. C. Etchebehere, ¶8.)[5]

12. All inmates—whether participating in Ramadan or not—were permitted to keep food in their cells that they had purchased from the canteen, such as: ramen soups, beans, candy, cookies, and other snacks. (Decl. C. Etchebehere, ¶9.)

13. Additionally, inmates at SATF routinely shared with each other items they had purchased from the canteen. (Decl. C. Etchebehere, ¶9.)

14. Inmates also commonly kept items from their sack lunches in their cells. (Decl. C. Etchebehere, ¶ 9.)

15. Beginning as early as May 2012, Defendant, the chaplains, and the Correctional Food Manager (CFM) Perkins began to plan for Ramadan at SATF. Early in the planning process, however, these individuals encountered difficulties identifying the Muslim inmates who could participate in Ramadan. (Decl. C. Etchebehere, ¶11.)[6]

///

///

---

[5] FACT No. 11. Plaintiff disputes this fact, stating that he was denied other foods by custody staff when he told them his name was not on the Ramadan list, and that he was not allowed to enter the dining hall, eat during regular meal times, or take sack lunches from the dining room when he was fasting. This does not cause a dispute of fact, because FACT No. 11 concerns inmates who, unlike Plaintiff, were <u>not</u> participating in Ramadan. Therefore, this fact is undisputed.

[6] FACT No. 15. Plaintiff disputes this fact, stating that Defendant failed to use the policy already in place by resident chaplains to approve and maintain Muslim inmate service lists, events, and religious diets, and to identify eligible Muslims for Ramadan participation. This does not cause a dispute of the fact that the named individuals had difficulties early in the planning process identifying Muslim inmates who could participate in Ramadan. Therefore, this fact is undisputed.

16. Defendant was informed that, in the years prior to her arrival, the preferred approach was to have the Muslim chaplain prepare the list of inmates to participate in Ramadan. (Decl. C. Etchebehere, ¶12.)

17. SATF's new Muslim chaplain began work on July 2, 2012. (Decl. C. Etchebehere, ¶20.)[7]

18. Without the assistance of a Muslim chaplain until July 2, 2012, Defendant and her staff found it more difficult to identify the Muslim inmates who could participate in Ramadan. (Decl. C. Etchebehere, ¶12.)[8]

19. Defendant and her staff sought to have a plan in place for Ramadan by no later than the middle of June 2012. (Decl. C. Etchebehere, ¶14.)[9]

20. Prior to May 2012, Defendant had never planned for Ramadan at SATF or any other CDCR institution. (Decl. C. Etchebehere, ¶15.)

21. THIS FACT IS DISPUTED: CDCR did not have any predefined policies or regulations that Defendant could consult regarding identifying the Muslim inmates for Ramadan. (Decl. C. Etchebehere, ¶¶16-17; Pl.'s Affidavit, ECF No. 42, ¶¶10, 22, 25.)

22. After speaking with SATF's chaplains, it was Defendant's understanding that most of SATF's Muslim inmates participated in the Religious Meat Alternate diet (RMA). (Decl. C. Etchebehere, ¶¶18-19.)

23. The RMA—colloquially called the "halal diet"—is a diet program that serves meat that is certified as "halal" and was designed for Muslim inmates. (Decl. C. Etchebehere, ¶18; see also Decl. A. Whisnand, Ex. A at Whisnand.014 [Pl.'s Dep., p. 32:16-32]; see also id.

///

---

[7] FACT No. 17. Based on disagreement between the parties about how long the planning process for Ramadan lasted, this fact has been altered by the court and is now undisputed.

[8] FACT No. 18. Based on disagreement between the parties about whether an easy method existed to identify Muslim inmates who could participate in Ramadan, this fact has been altered by the court and is now undisputed.

[9] FACT No. 19. Based on disagreement between the parties about whether a plan for Ramadan had to be in place by June 2012, this fact has been altered by the court and is now undisputed.

at Whisnand.057-058 [Pl.'s Dep., Ex. 3]; see also id. at Whisnand.019-020 [Pl.'s Dep., pp. 40:10 – 41:14]; see also Cal. Code Regs. tit. 15, § 3054.3.)

24.     According to Plaintiff's religious beliefs, foods that are halal are lawful for Muslims to consume, similar to the concept of "kosher" in Judaism.  (Decl. A. Whisnand, Ex. A at Whisnand.011-012 [Pl.'s Dep., pp. 27:22 – 28:6].)

25.     Defendant proposed to use the RMA diet list as a starting point for identifying the Muslim inmates who were eligible to participate in Ramadan.  (Decl. C. Etchebehere, ¶18.)[10]

26.     Defendant assumed that because the RMA diet served meat that was "certified as halal" and was designed for Muslim inmates, most of SATF's inmates were either already enrolled in the RMA or would quickly enroll after learning of the Ramadan policy.  (Decl. C. Etchebehere, ¶21.)[11]

27.     At the time Defendant proposed this policy, SATF was in the process of hiring a Muslim chaplain, A. Haroun.  (Decl. C. Etchebehere, ¶20.)[12]

28.     Chaplain Haroun was not scheduled to start work until July 2, 2012.  (Decl. C. Etchebehere, ¶20.)

29.     Defendant and her staff intended to use the RMA list as an initial method for identifying Muslim inmates who would participate in Ramadan, with the understanding that

///

///

_____

[10] FACT No. 25.  Plaintiff disputes this fact, offering as evidence an email from Defendant dated June 15, 2012, in which Defendant states "a Muslim Chaplain is scheduled to be on board the first week of July and we will leave the decision to him to ducat the inmates who will be participating in Ramadan."  (ECF No. 52 at 75.)  This does not create a dispute of fact whether Defendant proposed to use the RMA list as a starting point for identifying Muslim inmates.  Therefore, this fact is undisputed.

[11] FACT No. 26.  Plaintiff disputes this fact, offering as evidence an email from Defendant dated July 19, 2012, in which Defendant states that "the Muslim inmates added to the list were primarily vegetarians."  (ECF No. 52 at 77.)  Plaintiff's evidence does not create a dispute of fact as to what Defendant's assumption was at the time she planned to use the RMA list to identify Muslim inmates.  Therefore, this fact is undisputed.

[12] FACT No. 27.  Plaintiff disputes this fact but offers no evidence that Defendant did not propose this policy at the time SATF was in the process of hiring Chaplain Haroun.  Therefore, this fact is undisputed.

13

Chaplain Haroun would immediately identify any inmates who wanted to participate but were not initially identified. (Decl. C. Etchebehere, ¶20.)[13]

30.    Upon starting work, Chaplain Haroun was expected to meet the Muslim inmates on each of the facilities, and then reconcile the RMA list with the Muslim inmate population to determine which inmates were eligible to participate in Ramadan. (Decl. C. Etchebehere, ¶20.)[14]

31.    The goal of the policy was to quickly and efficiently identify as many of the potential Ramadan participants as possible, in order to reduce administrative burdens and to simplify the process for inmates, custody staff, and Food Services. (Decl. C. Etchebehere, ¶22-25, 43-44.)[15]

32.    The Ramadan policy was adopted in a memorandum entitled "Ramadan," dated July 11, 2012. (Decl. C. Etchebehere, ¶26.)

33.    Although the memorandum stated that there would be "no additions" to the list of Ramadan participants after the list had been finalized, Defendant intended for the Muslim chaplain to have discretion to add additional inmates if necessary. (Decl. C. Etchebehere, ¶27.)[16]

///

---

[13] FACT No. 29. Plaintiff disputes this fact, offering as evidence an email from Defendant dated June 15, 2012, in which Defendant states that "a Muslim Chaplain is scheduled to be on board the first week of July and we will leave the decision to him to ducat the inmates who will be participating in Ramadan." (ECF No. 52 at 75.) This does not create a dispute of fact whether Defendant proposed to use the RMA list as a starting point for identifying Muslim inmates. Therefore, this fact is undisputed.

[14] FACT No. 30. Plaintiff disputes this fact, offering as evidence emails from Defendant dated June 15, 2012, and July 19, 2012. (ECF No. 52, Ex. E, F.) Neither of these emails creates a dispute of fact about what Chaplain Haroun was expected to do upon starting work or whether he was expected to reconcile the list. Therefore, this fact is undisputed.

[15] FACT No. 31. Plaintiff disputes this fact, offering as evidence emails from Defendant dated June 15, 2012, and July 19, 2012. (ECF No. 52, Ex. E, F.) However, Plaintiff offers no evidence creating a dispute of fact as to the goals of the policy. Therefore, this fact is undisputed.

[16] FACT No. 33. Plaintiff disputes this fact, offering as evidence emails from Defendant dated June 15, 2012, and July 19, 2012. (ECF No. 52, Ex. E, F.) However, Plaintiff's evidence does not create a dispute of fact about Defendant's intentions. Therefore, this fact is undisputed.

34.     Defendant circulated the memorandum for approval on July 11, 2012.  (Decl. C. Etchebehere, ¶28.)

35.     July 11, 2012, was the first day that Chaplain Haroun was able to orient himself and meet the inmates and staff on each of SATF's facilities.  (Decl. C. Etchebehere, ¶29.)[17]

36.     On July 16, 2012, the office of the Chief Deputy Warden circulated the final, signed copy of the July 11, 2012, memorandum to the Facility Captains, the Associate Wardens, CFM Perkins, and CPM Cote.  (Decl. C. Etchebehere, ¶30.)

37.     Defendant also forwarded the final memorandum to all of SATF's chaplains to ensure that they would notify the inmates on their respective yards.  (Decl. C. Etchebehere, ¶31.)

38.     Defendant also personally instructed custody staff members to inform inmates wishing to participate in Ramadan to contact Chaplain Haroun as soon as possible to confirm their eligibility.  (Decl. C. Etchebehere, ¶32.)[18]

39.     Plaintiff claims that on July 18, 2012, the day before Ramadan began, all of the Muslim inmates on E-Facility were called to the E-Facility chapel for a Ramadan announcement.  (Decl. A. Whisnand, Ex. A at Whisnand.012 [Pl.'s Dep., p. 28:7-17]; see also Pl.'s SAC, ECF No. 24 at 3-4.)

40.     Plaintiff claims that during this announcement, CPM Coté notified him of the July 11, 2012, memorandum and the policies for Ramadan (i.e., that the Ramadan list would be based on the RMA diet list.  (Decl. A. Whisnand, Ex. A at Whisnand.013-014 [Pl.'s Dep., pp. 31:18 – 32:6]; see also Pl.'s SAC, ECF No. 24 at 3.)

41.     As of July 18, 2012, Plaintiff was enrolled in the vegetarian diet.  (Decl. A. Whisnand, Ex. A at Whisnand.015 [Pl.'s Dep., p. 33:1-5].)

---

[17] FACT No. 35.  Plaintiff disputes this fact with evidence that Chaplain Haroun started work on July 2, 2012.  However, Plaintiff provides no evidence that the chaplain was able to orient himself and meet inmates and staff before July 11, 2012.  Therefore, this fact is undisputed.

[18] FACT No. 38.  Plaintiff disputes this fact with evidence that he was not informed that he should consult Chaplain Haroun about his Ramadan eligibility.  This evidence does not create a dispute of fact as to what Defendant instructed her staff to do.  Therefore, this fact is undisputed.

42.     Despite the fact that the RMA diet served meat that was "certified as halal," Plaintiff was not enrolled in the RMA diet because he believed he could not be certain that the RMA meats were actually halal (i.e., whether the meats were slaughtered by Islamic butchers, handled correctly by food staff, packaged to be free from contamination, etc.).  (Decl. A. Whisnand, Ex. A at Whisnand.015-017 [Pl.'s Dep., pp. 33:6 – 35:3]; see also id. at Whisnand.020-021 [Pl.'s Dep., pp. 41:15 – 42:10].)

43.     But by the same token, Plaintiff could not be certain that all of the items in the vegetarian diet were actually halal.  (Decl. A. Whisnand, Ex. A at Whisnand.017 [Pl.'s Dep., p. 35:12-19].)[19]

44.     Plaintiff claims that CPM Coté also told him that he could file an inmate grievance if he was dissatisfied with the Ramadan policy.  (Decl. A. Whisnand, Ex. A at Whisnand.022-023 [Pl.'s Dep., p. 44:8 – 45:2]; see also Pl.'s SAC, ECF No. 24 at 5 ¶15 – 8 ¶25 & Ex. B.)

45.     On July 18, 2012, Plaintiff requested a form to enroll in the RMA diet and was referred to the Chaplain.  The next day, July 19, 2012, Plaintiff met with the Chaplain and filled out the form to enroll in the RMA diet.  (Decl. A. Whisnand, Ex. A at Whisnand.024-025 [Pl.'s Dep., pp. 47:15 – 48:6]; see also Pl.'s SAC, ECF No. 24 at 7.)[20]

46.     Plaintiff did not attempt to file an inmate grievance on July 18, 2012.  (Decl. A. Whisnand, Ex. A at Whisnand.023 [Pl.'s Dep., p. 45:5-10]; see also id. at Whisnand.041-042 [Pl.'s Dep., pp. 72:25 – 73:14]; see also Pl.'s SAC, ECF No. 24 at 11.)

///

---

[19] FACT No. 43.  Plaintiff disputes this fact, offering as evidence his affidavit of April 9, 2017, in which he states, "In Islam, all edible vegetables are Halal (lawful).  I participated in the vegetarian diet knowing that the majority of the food items on the tray would be Halal (lawful)."  (ECF No. 52 at 60 ¶41.)  Plaintiff appears to concede in his affidavit that he does *not* know if "all" of the foods on the vegetarian meal tray are halal.  Therefore, this fact is undisputed.

[20] FACT No. 45.  Plaintiff disputes this fact, offering as evidence the allegations in his SAC, in which he states that on July 18, 2012, he asked prison employee Doe I for a Religious Diet Request form, to sign up for the RMA diet, and was referred to the Chaplain.  The next day, on July 19, 2012, Plaintiff met with the Chaplain, obtained the form, filled it out, and gave it to the Chaplain.  (ECF No. 24 at 5 ¶15 – 8 ¶25 & Ex. B.)  For clarification, this fact has been altered by the court and is now undisputed.

47.     On July 19, 2012, the first day of Ramadan, Plaintiff claims that he went to the E-Facility chapel and contacted Chaplain Guembe about enrolling in the RMA diet.  Decl. A. Whisnand, Ex. A at Whisnand.024-025 [Pl.'s Dep., pp. 47:15 – 48:6]; see also Pl.'s SAC, ECF No. 24 at 7.)

48.     Plaintiff does not know how late it was when he met Chaplain Guembe to enroll in the RMA diet.  (Decl. A. Whisnand, Ex. A at Whisnand.025 [Pl.'s Dep., p. 48:7-11].)[21]

49.     Plaintiff claims that on July 19, 2012, he completed a CDCR Form 3030-D "Religious Diet Request," and submitted it to Chaplain Guembe, who immediately signed her approval onto the form.  (Decl. A. Whisnand, Ex. A at Whisnand.025-026 [Pl.'s Dep., pp. 48:12 – 49:15]; see also id. at Whisnand.028- 029 [Pl.'s Dep., pp. 51:19 – 52:19]; see also id. at Whisnand.060-062 [Pl.'s Dep., Ex. 4]; see also Pl.'s SAC, ECF No. 24 at 7-8; Pl.'s Affidavit, ECF No. 52 at 55 ¶4.)[22]

50.     Plaintiff claims that Chaplain Guembe informed him that she would forward the paperwork to her supervisor for approval.  (Decl. A. Whisnand, Ex. A at Whisnand.025-026 [Pl.'s Dep., pp. 48:12 – 49:15]; see also id. at Whisnand.028- 029 [Pl.'s Dep., pp. 51:19 – 52:19]; see also id. at Whisnand.060-062 [Pl.'s Dep., Ex. 4]; see also Pl.'s SAC, ECF No. 24 at 7-8.)[23]

///

---

[21] FACT No. 48.  Plaintiff disputes this fact, offering as evidence his entire SAC, ECF No. 24. (ECF No. 53 at 6 ¶48.)  The court finds no evidence in the SAC of the time of day Plaintiff met with the Chaplain. For clarification, this fact has been altered by the court and is now undisputed.

[22] FACT No. 49.  Plaintiff disputes this fact, stating in his April 9, 2017, affidavit, "On July 19, 2012, I filled out the RMA application and submitted it to Chaplain Guembe.  I discovered she approved the application many days after she informed me that she was forwarding my application.  Guembe informed me that I should receive my meals that night."  (ECF No. 52 at 55 ¶4.)  However, Plaintiff does not dispute the fact that Guembe's signature on the RMA application is dated July 19, 2012, and that she told him that day the application was approved.  (ECF No. 44-2 at 64, 65; ECF No. 24 at 8 ¶25.)  Therefore, this fact, as altered by the court, is undisputed.

[23] FACT No. 50.  Plaintiff disputes this fact, offering as evidence his affidavit, in which he states, "Guembe also approved my RMA application on 07/19/12, but did not place my name on the Ramadan list. She informed me that she would forward my application to someone who was authorized to do so."  (ECF No. 52 at 55 ¶10.)  Here, Plaintiff offers clarification but does not cause the fact as written to be disputed.  Therefore, this fact is undisputed.

51.     Plaintiff does not know whether Chaplain Guembe immediately submitted his paperwork, or to whom she submitted it.  (Decl. A. Whisnand, Ex. A at Whisnand.027 [Pl.'s Dep., p. 50:2-22]; see also id. at Whisnand.029 [Pl.'s Dep., p. 52:20-25].)[24]

52.     Plaintiff cannot be sure that Chaplain Guembe immediately submitted the paperwork to Defendant Etchebehere.  (Decl. A. Whisnand, Ex. A at Whisnand.027-028 [Pl.'s Dep., pp. 50:23 – 51:18]; see also id. at Whisnand.035 [Pl.'s Dep., p. 58:6-20]; see also id. at Whisnand.049-051 [Pl.'s Dep., pp. 86:13 – 88:3].)

53.     Plaintiff's name was likely not on the list of Ramadan participants for July 19, 2012.  (Decl. C. Etchebehere, ECF No. 44-5, ¶33; Decl. A. Whisnand, Ex. A at Whisnand.031-032 [Pl.'s Dep., pp. 54:6 – 55:10].)[25]

54.     On July 19, 2012, Defendant's staff updated the Ramadan list to include inmates who were not initially identified to participate in Ramadan, including certain inmates who were on the vegetarian diet.  (Decl. C. Etchebehere, ECF No. 44-5, ¶¶33-34.)[26]

55.     But because the updated list was finalized late in the day—after the food for July 19, 2012 had already been prepared—it was not effective until July 20, 2012.  (Decl. C. Etchebehere, ECF No. 44-5, ¶34.)[27]

///

---

[24] FACT No. 51.  Plaintiff disputes this fact, offering as evidence ¶10 of his affidavit and pp. 49-50 of his deposition.  The court finds that Plaintiff's deposition testimony at pp. 50:8 – 51:18 confirms that Plaintiff did not know whether Chaplain Guembe immediately submitted his paperwork, or to whom she submitted it, and ¶10 of Plaintiff's affidavit offers no evidence to the contrary.  (ECF No. 44-2 at 31-32, ECF No. 52 at 55 ¶10.)  Therefore, this fact is undisputed.

[25] FACT No. 53.  Plaintiff disputes this fact, offering as evidence his affidavit, ¶¶5, 14, 23, in which he alleges that is name was not on the Ramadan list until the night of July 25, 2012.  Plaintiff's evidence supports FACT No. 53.  Therefore, this fact is undisputed.

[26] FACT No. 54.  Plaintiff disputes this fact, offering as evidence his affidavit, ¶¶5, 12, 13, 14, 23, in which he alleges that his name was not on the Ramadan list until the night of July 25, 2012.  However, the fact that his name was not on the list used by the correctional officers does not create a dispute of fact whether Defendants' staff updated the list as stated.  Therefore, this fact is undisputed.

[27] FACT No. 55.  Plaintiff disputes this fact, offering as evidence his affidavit, ¶¶5, 12, 13, 14, 23, in which he alleges that his name was not on the Ramadan list until the night of July 25, 2012.  However, the fact that his name was not on the list does not cause a dispute of fact of when the updated list became effective.  Therefore, this fact is undisputed.

56.     Plaintiff's name appeared on the list that was updated by Defendant on July 19, 2012, and effective on July 20, 2012.  (Decl. C. Etchebehere, ECF No. 44-5, ¶40.)[28]

57.     Defendant circulated the updated list to the chaplains and the Facility Captains, among others, with instructions that the list would be effective July 20, 2012.  (Decl. C. Etchebehere, ¶¶35-36, 38.)[29]

58.     Defendant also instructed these individuals to inform the Muslim inmates to contact Chaplain Haroun if they had any trouble receiving their Ramadan meals.  (Decl. C. Etchebehere, ¶37.)[30]

59.     Plaintiff claims he was unable to receive his Ramadan meals on July 19, 2012, because his name did not appear on the list.  (Decl. A. Whisnand, Ex. A at Whisnand.031-032 [Pl.'s Dep., pp. 54:6 – 55:10].)

60.     At the time Plaintiff was denied entry to the dining hall on July 19, 2012, Defendant had already left the institution for the day.  (See Decl. A. Whisnand, Ex. A at Whisnand.033-034 [Pl.'s Dep., pp. 56:19 – 57:21].)

///

---

[28] FACT No. 56.  Plaintiff disputes this fact, offering evidence that he was denied Ramadan meals between July 19, 2012, and July 25, 2012, because his name was not on the list being used by correctional officers to decide which inmates could enter the dining hall.  (Pl.'s Affidavit, ECF No. 52, ¶¶5, 12, 13, 14, 23.)  Defendant's evidence shows that Plaintiff's name was on the updated list for July 20, 2012.  (Ex. H to Decl. C. Etchebehere, ECF No. 44-5 at 81.)  However, Defendant acknowledges that it is possible that custody staff who worked Facility E's dining hall did not receive or print the updated list that she sent out on July 19, 2012.  (Decl. C. Etchebehere, ECF No. 44-5, ¶42.)  Defendant also admits that she does not know why Plaintiff was denied entrance to the dining hall from July 20, 2012 through July 24, 2012.  (Id., ¶40.)  This fact as written is undisputed; however, it is also undisputed that Plaintiff claims he was denied entrance to the dining hall because his name was not on the list being used by correctional officers (See UF #61.).

[29] FACT No. 57.  Plaintiff disputes this fact, stating that on the nights of July 19, 2012, through July 24, 2012, prison officials denied Plaintiff entry into the dining hall because his name was not on the Ramadan list, that officials showed Plaintiff the list, and that Plaintiff confirmed that his name was not on the list (Pl.'s Affidavit, ECF No. 52, ¶¶5, 12, 23).  (ECF No. 53 at 7 ¶57.)  However, Plaintiff provides no evidence that Defendant did not circulate the updated lists as stated.  Therefore, this fact is undisputed.

[30] FACT No. 58.  Plaintiff disputes this fact, stating that no one informed him to contact the Chaplain "prior to July 18, 2012 to July 25, 2012," or informed him that his problem had been resolved or that he would be receiving his Ramadan meals starting on July 20, 2012 (Pl.'s Affidavit, ECF No. 52, ¶¶11, 27).  (ECF No. 53 at 7 ¶58.)  Plaintiff provides no evidence contesting what Defendant instructed her employees to do if inmates had trouble receiving their Ramadan meals.  Therefore, this fact is undisputed.

61. Plaintiff claims that he was also denied entry to the dining hall for Ramadan from July 20, 2012, through July 24, 2012. (Decl. A. Whisnand, Ex. A at Whisnand.037 [Pl.'s Dep., p. 67:10-21]; id. at Whisnand.038-039[Pl.'s Dep., pp. 68:21 – 69:4]; id. at Whisnand.039-030 [Pl.'s Dep., pp. 69:19 – 70:2]; id. at Whisnand.040 [Pl.'s Dep., p. 70:8-21]; id. at Whisnand.043 [Pl.'s Dep., p. 75:2-21].)

62. Defendant does not know why Plaintiff could not receive his Ramadan meals beginning on July 20, 2012, as his name appeared on the updated list. (Decl. C. Etchebehere, ¶¶40, 42.)[31]

63. Defendant was not present at the dining halls on each night of Ramadan when individual inmates were being let into the dining halls. (Decl. C. Etchebehere, ¶41.)[32]

64. Plaintiff did not file an inmate grievance until the night of July 23, 2012 – four days after Ramadan had begun. (Decl. A. Whisnand, Ex. A at Whisnand.023 [Pl.'s Dep., p. 45:5-10]; see also id. at Whisnand.041-042 [Pl.'s Dep., pp. 72:25 – 73:14]; see also Pl.'s SAC, ECF No. 24 at 11; id. at 27.)

65. Plaintiff was allowed entry in the E-Facility dining hall on July 25, 2012, to receive his Ramadan meals. (Decl. A. Whisnand, Ex. A at Whisnand.044 [Pl.'s Dep., p. 76:18]; see also id. at Whisnand.049 [Pl.'s Dep., p. 86:1-3].)

66. From July 25, 2012 onward, Plaintiff was able to receive Ramadan meals for the remainder of Ramadan. (Decl. A. Whisnand, Ex. A at Whisnand.044 [Pl.'s Dep., p. 76:19-22].)

67. Defendant did not intend to exclude Plaintiff, or any Muslim inmate, from receiving their Ramadan meals.[33]

---

[31] FACT No. 62. Plaintiff disputes this fact, claiming that his name did not appear on the Ramadan list until the night of July 25, 2012, and Defendant was solely responsible for ensuring that Plaintiff's name was on the list. (ECF No. 52 ¶¶13, 18, 19.) However, Plaintiff offers no evidence or personal knowledge showing that Defendant knows what happened. Therefore, this fact is undisputed.

[32] FACT No. 63. Plaintiff disputes this fact, claiming that Defendant was personally responsible for violation of his rights. However, Plaintiff has not disputed that Defendant was not present at the dining halls on each night of Ramadan. ECF No. 56 at 22 ¶63.) The court has altered this fact for clarification, and this fact is now undisputed.

[33] FACT No. 67. Plaintiff disputes this fact, asserting that Defendant was responsible for him being deprived of Ramadan meals because his name did not appear on the list and Defendant required him to

68.     Plaintiff has never met Defendant Etchebehere.  (Decl. A. Whisnand, Ex. A at Whisnand.018 [Pl.'s Dep., p. 37:8-22]; see also id. at Whisnand.035-036 [Pl.'s Dep., pp. 58:18 – 59:2].)

69.  Defendant also did not intend to coerce Plaintiff or any Muslim inmates to enroll in the RMA diet.[34]

70.     In addition to celebrating Ramadan every year, Muslim inmates at SATF could practice their religion in a multitude of ways, such as: praying on their own or with others in their cells, the dayroom, or the yard; attending regularly scheduled religious services (e.g., weekly "Jumu'ah" prayer on Fridays); using prayer rugs; and reading the Quran.  (Decl. C. Etchebehere, ¶46; see Decl. A. Whisnand, Ex. C at Whisnand.078-079 [Pl.'s Resps. Def.'s RFAs Nos. 1-8 (re: religious property)].)[35]

71.     Beginning the second week of Ramadan in 2012, the Muslim inmates were also afforded an additional thirty minutes of prayer time before their evening meal.  Defendant helped coordinate this accommodation.  (Decl. C. Etchebehere, ¶47.)

72.     Even when Plaintiff was unable to attend Ramadan, he still was able to attend prayer sessions with fellow Muslim inmates.  Decl. A. Whisnand, Ex. A at Whisnand.030 [Pl.'s Dep., p. 53:1-17]; see also id. at Whisnand.030-031 [Pl.'s Dep., pp. 53:25 – 54:5]; see also id. at Whisnand.037 [Pl.'s Dep., p. 67:10-21]; see also id. at Whisnand.038 [Pl.'s Dep., p. 68:17-20].)[36]

---

participate in the RMA diet in order to receive Ramadan meals.  (Pl.'s Affidavit, ECF No. 52 at 54, ¶¶1, 13, 15, 16.)  However, Plaintiff offers no evidence of Defendant's state of mind.  Therefore, this fact is undisputed.

[34] FACT No. 69.  Plaintiff disputes this fact, stating that "C. Etchebehere did require me to participate in the RMA diet in order to receive my Iftar and Suhoor Meals."  (Ptf's Affidavit, ECF No. 52, ¶¶1, 13, 15, 17.)  However, the fact that Plaintiff was required to be on the RMA diet list to participate in Ramadan is not evidence of coercion.  Therefore, this fact is undisputed.

[35] FACT No. 70.  This fact has been altered by the court in response to Plaintiff's statement in his affidavit that "[p]urchasing, borrowing or listening to music is not a form of religious practice of expression in Islam."  (ECF No. 52 at 60 ¶42.)  Therefore, this fact is undisputed.

[36] FACT No. 72.  Plaintiff disputes this fact, submitting as evidence his affidavit of April 9, 2017, ¶¶16, 17, ECF No. 52 at 56.  (ECF No. 53 at 8 ¶72.)  Plaintiff's affidavit, ¶¶16, 17 offers no evidence that this fact is not true.  Therefore, this fact is undisputed.

73.     Plaintiff never asked other inmates for food during the period in which he could not receive his Ramadan meals.  (Decl. A. Whisnand, Ex. A at Whisnand.045 [Pl.'s Dep., p. 80:2-5].)

74.     Plaintiff never sought medical attention for the headaches he claims to have suffered during the period of July 19, 2012, through July 25, 2012.  (Decl. A. Whisnand, Ex. A at Whisnand.045 [Pl.'s Dep., p. 80:6-16]; see also id. at Whisnand.008 [Pl.'s Dep., p. 15:7-14].)

75.     Plaintiff has no documents to support his claim that he experienced emotional distress as a result of the conduct at issue in the Second Amended Complaint.  Decl. A. Whisnand, Ex. A at Whisnand.007-008 [Pl.'s Dep., pp. 14:20 – 15:6].)

## VI.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Etchebehere moves for summary judgment on Plaintiff's claim for violation of the Free Exercise Clause of the First Amendment, on the grounds that (1) Defendant was not personally responsible for at least five of the six days that Plaintiff did not receive his Ramadan meals, and that missing one day of Ramadan meals was not a substantial burden on Plaintiff's religious rights; (2) Defendant's proposal to use the RMA list as the starting point for identifying the Muslim inmates was reasonably related to legitimate institutional interests; and (3) Defendant is entitled to qualified immunity, because no reasonable prison official in Defendant's position would have believed that her conduct violated Plaintiff's clearly established religious rights.

Defendant offers as evidence her own declaration (ECF No. 44-5), the declaration of defense counsel A. Whisnand (ECF No. 44-2), excerpts from Plaintiff's deposition transcript (ECF No. 44-2, Ex. A), Ramadan Memo by Defendant dated July 12, 2012 (ECF No. 44-2, Ex. 2), documentation of the 2012 Ramadan schedule at SATF (Exhibits to ECF No. 44-5), Plaintiff's prison appeal submitted on July 23, 2012 (ECF No. 44-2, Ex. 5), Plaintiff's RMA diet application (ECF No. 44-2, Ex. 4), Title 15 § 3054 (CDCR regulations – Religious Diet Program) (ECF No. 44-2, Ex. 3), and Plaintiff's responses to Defendant's request for admissions (ECF No. 44-2, Ex. B).

///

## A.    Defendant Not Responsible

Defendant argues that she was not personally responsible for Plaintiff missing more than one day of Ramadan meals because Plaintiff did not attempt to enroll in the RMA diet until the first day of Ramadan and cannot be sure he enrolled in time or that his form was immediately sent to Defendant so that Plaintiff could be added to the Ramadan list.  Defendant cites the following evidence.

Plaintiff testified at his deposition:

Q.    All right. Now, in your Second Amended Complaint, and that's the most recent Complaint, so, that's what I'm going to be talking about today, you state that on July 18th, 2012, which if I'm not mistaken was the day before Ramadan was supposed to start, that your building officer sent you to the Echo yard chapel for Ramadan announcement. What time of day was that announcement; if you can recall?

A.    It had to be after 12:00 o'clock. I believe it was after 12:00 o'clock, somewhere around 1:00, 1:30. It had to be in the afternoon.

(Pl.'s Dep., p. 28:7-17, ECF No. 44-2, Ex A.)

Q.    So, a moment ago you were testifying how Ms. Cote was explaining who could participate in Ramadan. What did she say about that?

A.    Well, she just was letting us know that the Ramadan was starting tomorrow, around tomorrow, and that the only people that were going to be allowed to participate in the program were those who were on a halal RMA, not the -- but the RMA, which is a religious meat alternate program, those individuals that were signed up for that particular program.

Q    Okay.

A.    And if we weren't on the list to receive the RMA meals, that we were not going to be allowed to participate on Ramadan.

(Id., pp. 31:18 – 32:6.)

In the SAC, Plaintiff stated:

On or around July 18, 2012, my building officers sent me to the Echo-Yard Chapel for a Ramadan announcement.  When I arrived, Doe I (a petite hispanic or Native American female employee) informed me, by way of a 7/11/12 memo authored and signed by Defendant Etchebehere, that I had to be a participant in the CCR T15 Religious Meat Alternate Program (hereinsfter "RMA") in order to receive my Ramadan Meals.

(ECF No. 24 at 3-4.)

Q. Okay. So, I think that kind of summarizes your claim, but I'm going to break it down a little bit day by day. So, on July 18th, after you received this announcement from Cote, you had decided that you were going to sign up for the RMA diet; is that right?

A. Yeah.

Q. Then on July 19th, that's the date that you go to the chapel and you speak to, I think her name is pronounced Guembe?

A. Guembe.

Q. Guembe?

A. Guembe.

Q. Yeah. You approached her about signing up for the RMA diet on the 19th?

A. Uh-huh.

Q. Was that a yes, I'm sorry?

A. Yes.

Q. And what time of day was that that you spoke with Chaplain Guembe?

A. I don't know if it was in the morning – I don't know if it was in the morning or afternoon. I can't recall.

(Pl.'s Dep., pp. 47:15-48:11, ECF No. 44-2, Ex. A.)

On July 19, 2012, (first day of Ramadan), I went to the Echo-Yard Chapel and met with Defendant Guembe to sign-up for the R.M.A. diet.

(ECF No. 24 at 7 ¶21.)

Q. Okay. So, what did that exchange look like? You go to the chapel and Guembe is there. What happens? What do you say to each other?

A. As soon as I come in she says "Happy Ramadan." I said "Thank you." I said, "I'm here. I'm going to need a religious diet because I'm being required to sign up for the RMA." And her response was, "Yeah. I saw that. I don't know why, you know, they're making you get rid of your vegetarian diet and have to sign up for that." We exchanged that. I asked her, I said, "Well, can you call, and, you know, have me placed on a Ramadan?" She said "Well, no, I can't do that." I asked her if she can just put me on Ramadan and she said "No, I can't do that." I said, "Well, can you call the person responsible and see if I can be held exempt from having to sign up for this RMA diet and just without -- and get my Ramadan meals?" And she says, well, she would let her supervisor know. She couldn't call, but she would let her supervisor know. I said "Okay." I filled out the application anyway, and she asked me to step out of the office, and she locked it and went into the program office. Then she came back, called me in and said, "Okay. Everything's done. I forwarded everything over and you should get your Ramadan meals

tonight." That's the exchange that I had with her on that particular day, I think it was the 19th, the day that I signed the application.

(Pl.'s Dep., pp. 48:12-49:15, ECF No. 44-2, Ex. A.)

Q.   But she didn't -- she didn't explain to you what she was doing in the office?

A.   No. She just told me to come out. She left, took papers with her and came back and gave me back my ID card, my vegetarian card, and told me that I should be approved and I should be on the list tonight.

Q.   So, she didn't say that she had called anybody or faxed anything. She just basically said that you should be good to go, but didn't give details?

A.   I just assumed that's what she was doing, that she was going to fax my application because I just signed and I filled out the application, because that's what she had in her in hand when she went to the program office. I can't say what she did in the program office. She did -- when she came back, she called me back into the office and gave me -- she said she wanted to get a copy of my vegetarian card, and she took that, she came back, she handed it to me and told me that I should be getting my Ramadan meals tonight, and that was on the 19th.

Q.   Okay. That makes sense. On your Complaint, on page 7 –

A.   Uh-huh.

Q.   -- paragraph 24, you state something similar to what you just said, and I just want to confirm. "She – "meaning Guembe," -- said she wanted to get me a copy of it because she was going to forward them both to Etchebehere right away so that I would be put on the Ramadan participation list." Did she say those exact words, that she was going to forward them to Etchebehere? Did she say Etchebehere's name?

A.   She didn't say Etchebehere's name.

Q.   Okay.

A.   But when I realized who was the person was responsible for the program, I put that in there. I put that because I thought this was the person that she was going to be forwarding to. So, I put that in there, okay. I have no idea who she forwarded it to. I just assumed, because she said I should be on the list tonight, I assumed this was the person that could only give her that type of confirmation was Etchebehere.

(Id., pp. 50:2-51:18.)

Q.   I'd like to circle back to a couple things we talked about at the beginning. So, on July 19th, which is the date that you talked to Guembe and she copied your Religious Diet Request Form, I believe you testified earlier that she took it back into the program office or the chapel office; is that correct?

A.   She asked me to step out, she locked the chapel door and then she walked to the program office.

Q.    And how long was she gone for?

A.    I was sitting out in front of the chapel for about maybe five minutes, five, six minutes.

Q.    And when she comes back, to the extent that you can remember exactly what she said, I'd like you to tell me exactly what she said, but if you don't, if you can just summarize the gist of what she said to you.

A.    She opened the chapel door and called me back into her office. She said, "Okay" – she handed me my vegetarian diet card. She said "I forwarded everything and you should be receiving your Ramadan meals tonight."

Q.    She didn't say how she forwarded it, did she?

A.    No. No.

Q.    She didn't say like I faxed it or emailed it or anything?

A.    No.

Q.    And she didn't say who she forwarded it to?

A.    No. What she told me was, she asked me before she left, or before she put me out of the chapel she said "Let me get your -- do you have your vegetarian card?" I said "Yeah." She said "Well, I want to get a copy of that." Then when she came back, she left, came back, and then she called me back in and gave me back my ID card and said "I forwarded everything. You should be receiving your Ramadan meals tonight." That's it.

Q.    As of today, did you ever learn who she forwarded that information onto?

A.    No.

(Id., pp. 86:13-88:3.)

Defendant Etchebehere declares:

Using the list provided by Chaplain Haroun, Office Assistant J. Hilger typed up the initial Ramadan eligibility list on or about July 18, 2012—the day before Ramadan. I am unable to locate a copy of the list that was used on the evening of July 19, 2012—the first night of Ramadan. Inmate Ahdom attached to his Second Amended Complaint what appears to be the eligibility list from July 19, 2012 (see ECF No. 24 at 23), but I am unable to verify whether that document is authentic. Inmate Ahdom's name does not appear on that list. On July 19, 2012, Office Assistant Hilger updated the Ramadan list to include additional inmates, including certain inmates who were on the vegetarian diet and therefore were not initially identified to participate in Ramadan. Mr. Hilger forwarded the updated list to me on July 19, 2012, at 3:12 p.m. Unfortunately, by this time, the updated list could not be used until the next day, July 20, 2012, because the food for July 19, 2012 had already been prepared. I forwarded the updated Ramadan list to the Facility Captains and the Chaplains shortly after Mr. Hilger sent it to me. A true and correct copy of the e-mail I forwarded from Mr. Hilger on July

19, 2012, is attached as Exhibit G. (Ex. G at Etchebehere.024-035.) In red font, bolded and in capital letters, I noted: "THIS LIST WILL NOT BE EFFECTIVE UNTIL TOMORROW (FRIDAY, JULY 20, 2012) NIGHT AS THE FOOD FOR TONIGHT HAS ALREADY BEEN PREPARED." (Ex. G at Etchebehere.025.) I wanted to make it clear to custody staff that they should print off the updated list and have it ready for July 20, 2012.

(Decl. C. Etchebehere, ¶¶33-36.)

I also wrote: "If any inmates come up to your staff and insist they are Muslim and should be practicing Ramadan tonight, please inform them that an updated list will be coming out tomorrow. They can contact the Muslim Chaplain, A. Haroun, tomorrow if there is a problem." (Ex. G at Etchebehere.025.) A few minutes later, I also forwarded this e-mail, including the attached updated eligibility list to the Lieutenants and Correctional Counselor Supervisors on my Complex. A true and correct copy of this e-mail and attachment is attached to this declaration as Exhibit H. (Ex. H at Etchebehere.036-047.)

(Id. ¶¶37, 38.)

I am aware of inmate Ahdom's claim that he was not permitted to enter the dining hall for Ramadan from the evening of July 19, 2012, through the evening of July 24, 2012. I would expect that inmate Ahdom was denied entrance to the dining hall on July 19, 2012, because custody staff could not yet use the updated list until July 20, 2012. However, I do not know why inmate Ahdom was denied entrance to the dining hall from July 20, 2012 through July 24, 2012. Inmate Ahdom's name appeared on the updated list, therefore the custody staff from Facility E should have permitted him to enter the dining hall for Ramadan beginning on July 20, 2012.

(Id. ¶40.)

It is possible that custody staff who worked Facility E's dining hall did not receive or print the updated list that I sent out on July 19, 2012. (Ex. G at Etchebehere.025.) I re-forwarded the updated list to Facility E's Captain, R. Tolson, on July 23, 2012 at 2:48 p.m. I do not recall why I re-forwarded the e-mail, because the body of the e-mail is blank. A true and correct copy of the e-mail that I forwarded to Captain Tolson is attached as Exhibit I. (Ex. I at Etchebehere.048-059.)

(Id. ¶42.)

I was not responsible for letting individual inmates into the dining halls each night of Ramadan.

(Id. ¶41.)

## B. One Day Not a Substantial Burden

Defendant argues that missing one day of Ramadan meals did not substantially burden Plaintiff's religious rights, because Ramadan is a month-long observance and missing one day, or even six, out of thirty is a de minimis burden, and there is no evidence that Plaintiff was unable to observe the other aspects of Ramadan, such as praying, reading the Quran, and

limiting conversation. Defendant further argues that Plaintiff failed to take measures to limit

the harm, such as picking up a normal sack lunch to take back to his cell, purchasing items

from the canteen, asking other inmates to share their canteen items with him, seeking medical

attention, or timely filing an inmate grievance. Defendant offers the following evidence.

> Q.   Before we went off the record, Mr. Ahdom, we were talking about how Ms. Cote indicated that you could 602 or appeal the Ramadan policy. Did – when did you file a 602 on that policy?
>
> A.   I believe it was on the 23rd, July 23rd. Yeah, July 23rd.

(Pl.'s Dep., pp. 44:5-10, ECF No. 44-2, Ex. A.)

> Q.   Okay. So, it's the night of July 23rd that you file your 602, correct?
>
> A.   That's correct.
>
> Q.   Okay. Go ahead and turn to the document in front of you that I labeled Exhibit 5, and I'll ask the court reporter to attach it to the record, and it appears to be an Inmate Parolee Appeal CDCR Form 602, and I'll ask you, Mr. Ahdom, whether you recognize this document here.
>
> (Whereupon Exhibit 5 is marked.)
>
> THE WITNESS:      Yes.
>
> BY MR. WHISNAND:
>
> Q.   Is this the 602 or inmate appeal we've been talking about?
>
> A.   Yes, it is.

(Id., pp. 72:25-73:14.)

> And on July 23, 2012, I filed an official grievance challenging Defendant Etchebehere's denial of my Ramadan (Iftar and Sujhoor) meals because I was not a participant in the R.M.A. Program.

(SAC, ECF No. 24 at 11 ¶36.)   (The copy of Plaintiff's prison appeal also shows it was

submitted on July 23, 2012.  (Id. at 27.))

### C.   Policy Reasonably Related to Legitimate Penological Interests

Defendant argues that even if Plaintiff's rights were substantially burdened,

Defendant's proposal to use the RMA list was objectively reasonable under the circumstances,

and the policy underlying its use advanced legitimate penological interests. Defendant argues

that without a Muslim chaplain to assist her, using the RMA list was the most efficient and

viable way for Defendant to identify the majority of the Muslim inmates without undue administrative burden. Defendant submits the following evidence.

> Ramadan is an annual, month-long religious fast observed by Muslims. During Ramadan, Muslims fast from dawn to sunset, and only eat food and drink from sunset to sunrise. In 2012, Ramadan was observed at SATF beginning on the evening of July 19, 2012, and ending on August 18, 2012.

(Decl. C. Etchebehere, ¶6.)

> Q.    So, the difference being that you went to the chow hall, then your name was on the list that night on the 25th?
>
> A.    Yes. I don't know if it was on the list, but they gave me access to the -- when I gave them my ID card, he said, "Come on in." I didn't look at the actual document that he had in his hand, but he took my ID card and said "Go in."
>
> Q.    Then, from that night, the 25th, until the end of Ramadan, were you able to go each subsequent night into the chow hall to receive your meal?
>
> A.    Yes, I was.

(Pl.'s Dep., pp. 76:11-22, ECF No. 44-2, Ex. A.)

> Q.    And then on the 25th is the first evening you're able to go to Ramadan, right –
>
> A.    That's correct.

(Id., pp. 86:1-3.)

> In 2012, Ramadan was observed at SATF beginning on the evening of July 19, 2012, and ending on August 18, 2012.

(Decl. C. Etchebehere, ¶6.)

> In addition to celebrating Ramadan every year, Muslim inmates at SATF could practice their faith in a multitude of ways, including: praying on their own or with others in their cells, the dayroom, or the yard; attending regularly scheduled religious services (e.g., weekly "Jumu'ah" prayer on Fridays); using prayer rugs; reading the Quran; borrowing religious books from the library or chapel; and purchasing various religious property, such as music, prayer oils, beads, and caps, from approved vendors. Additionally, on July 27, 2012, the Warden's office sent out an e-mail to custody supervisors, including me, attaching a memorandum entitled "Ramadan Prayer Time," dated July 26, 2012. The memorandum stated that, at the request of Chaplain Haroun, Muslim inmates were to be released to the dining halls thirty minutes early for the remainder of Ramadan, in order that the inmates could have dedicated prayer time before their meal. I forwarded the e-mail and the attached memorandum to my staff, and instructed them to distribute it to the lieutenants who would be on shift during the prayer time. I wanted to ensure that the third watch lieutenants communicated to their staff that the Muslim inmates were to receive their additional thirty minutes of prayer time. I also forwarded this e-mail to all of the

Chaplains. True and correct copies of the e-mails that I received from the Warden, forwarded to my staff, and forwarded to the Chaplains are attached as Exhibit J, Exhibit K, and Exhibit L, respectively. (Ex. J at Etchebehere.060.063; Ex. K at Etchebehere.064-067; Ex. L at Etchebehere.068-071.)

(Decl. C. Etchebehere, ¶¶46, 47.)

**Request For Admission No. 1:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess a Quran.

> **Response To Request For Admission No. 1:**
>
> Plaintiff has made a reasonable inquiry and admits that he could possess a Quran.

**Request For Admission No. 2:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess prayer oil.

> **Response To Request For Admission No. 2:**
>
> Plaintiff has made a reasonable inquiry and admits that he could have possessed prayer oil.

**Request For Admission No. 3:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess a prayer mat/rug.

> **Response To Request For Admission No. 3:**
>
> Plaintiff has made a reasonable inquiry and admits that he could have possessed a prayer mat/rug.

**Request For Admission No. 4:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess prayer beads.

> **Response To Request For Admission No. 4:**
>
> Plaintiff has made a reasonable inquiry and admits that he could have possessed prayer beads.

**Request For Admission No. 5:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess a religious medallion.

> **Response To Request For Admission No. 5:**
>
> Plaintiff has made a reasonable inquiry and admits that he could have possessed a religious medallion.

**Request For Admission No. 6:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess a Kufi cap.

**Response To Request For Admission No. 6:**

Plaintiff has made a reasonable inquiry and admits that he could have possessed a Kufi cap.

**Request For Admission No. 7:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess a Miswak.

**Response To Request For Admission No. 7:**

Plaintiff has made a reasonable inquiry and admits that he could have possessed a Miswak.

**Request For Admission No. 8:**

Admit that in July 2012, at the California Substance Abuse Treatment Facility and State Prison – Corcoran (SATF), you could possess religious books/literature.

**Response To Request For Admission No. 8:**

Plaintiff has made a reasonable inquiry and admits that he could have possessed religious books/literature.

(Pl.'s Resps. Def.'s RFAs Nos. 1-8 (re: religious property))

Q.      Okay. Okay. Now, I'd like to talk about the evening of July 19th. So, after you had given this to Guembe and she had said that she would take care of it, what happened after that?

A.      I left and went home, I believe. I left and went home.

Q.      And then later that night did you go back to the chapel?

A.      I did.

Q.      Okay. Who did you approach at the chapel?

A.      Well, we had a -- we had our prayer service at the chapel, and I hadn't approached anyone regarding receiving the Ramadan meals because at that particular time I thought everything was going to be fine with me receiving my Ramadan meal. So, I had no reason to talk to anyone regarding the Ramadan meal, because I had already spoken to Guembe.

(Pl.'s Dep., p. 53:1-17, ECF No. 44-2, Ex. A.)

Q.      Okay. And, so, you had -- you went to a prayer service, what time was that prayer service?

A.      The Ramadan program, I believe back then it started at about right after count clears, 5:30, 6:00 o'clock, they release us to go to the chapel, right after the count clears.

(Id., pp. 53:25-54:5.)

Q.      Basically, what happens when you go to the chapel on 20th?

A.      When I go to the chapel I -- we do our Ramadan program. We do our prayer, and sunset, we do another prayer before we go to the chow hall, and when we got to the chow hall and an officer came out and he beckoned us towards the door, and everybody was giving him anxiety. He was checking off who was on the Ramadan list, and when I got to the door and handed him my ID card, he said, "You're not on the list." So, I didn't have access, he turned it around, and I got to go back to the cell.

(Id., p. 67:10-21.)

Q.      Okay. Then that evening, did you attend the prayer service again as you did in the chapel as you did the night before?

A.      I did.

(Id., p. 68:17-20.)

By contrast, inmates not participating in Ramadan would remain on the normal feeding schedule and program: these inmates would receive a hot breakfast in the dining hall, a sack lunch to take back to their cells, and a hot dinner in the dining hall. All inmates—whether participating in Ramadan or not—were permitted to keep in their cells food that they had purchased from the canteen. The canteen at SATF sold a variety of food items at that time, such as ramen soups, beans, candy, cookies, and other snacks. Additionally, although inmates were technically prohibited from exchanging food, inmates at SATF routinely shared with each other items that they had purchased from the canteen. Inmates also commonly kept items from their sack lunches in their cells.

(Decl. C. Etchebehere, ¶¶8, 9.)

Q.      And why is that that you wouldn't ask any inmates for food during that time period?

A.      That's just not something that I would do. I don't do that.

Q       At any point from July 19th through July 25th, did you seek medical attention for the headaches you were experiencing?

A.      I don't -- I don't remember. I don't recall. I don't recall if I -- because I knew where the headaches were coming from. I knew it wasn't something that I had the flu or anything. I knew what the cause of my pain and suffering was from. So, it was not like a medical professional could cure that. The only thing that could cure that is if I was being provided with some food. So, no.

(Pl.'s Dep., p. 80:2-16, ECF No. 44-2, Ex. A.)

Q.      Okay. Request for Production No. 7 says "All documents that support your claim that you have experienced pain and suffering as a result of the alleged wrongful conduct of defendant as described in your Second Amended Complaint." Are there any documents responsive to that request?

A.      No documents.

(Id., p. 15:7-14.)

Q.      In the Complaint you also state at the July 18 meeting with Ms. Cote, that she told that you could 602 the Ramadan policy, and what do you mean by "602"?

A.      She said that you 602 it, you know. She was not -- she was not authorized to go outside of the memorandum and what Etchebehere had actually ordered in the memorandum, and she couldn't overturn that by providing me with -- make an exception for me because I was a vegetarian, you know. She would have to follow, you know, the actual memorandum.

Q.      Right.

A.      And she was not authorized to do that.

Q.      Right.

A.      That's basically what I'm saying here.

Q.      Now, I think I understand what you mean by saying that you could 602 it, but just for the record, what does that mean, to 602 something?

A.      That means that I can appeal the decision of Etchebehere.

(Id., p. 44:8-45:2.)

Q.      Before we went off the record, Mr. Ahdom, we were talking about how Ms. Cote indicated that you could 602 or appeal the Ramadan policy. Did – when did you file a 602 on that policy?

A.      I believe it was on the 23rd, July 23rd. Yeah, July 23rd.

(Id., pp. 44:5-10.)

Q.      Okay. So, it's the night of July 23rd that you file your 602, correct?

A.      That's correct.

Q.      Okay. Go ahead and turn to the document in front of you that I labeled Exhibit 5, and I'll ask the court reporter to attach it to the record, and it appears to be an Inmate Parolee Appeal CDCR Form 602, and I'll ask you, Mr. Ahdom, whether you recognize this document here.

                (Whereupon Exhibit 5 is marked.)

THE WITNESS:        Yes.

33

BY MR. WHISNAND:

Q.     Is this the 602 or inmate appeal we've been talking about?

A.     Yes, it is.

(Id., pp. 72:25-73:14.)

> And on July 23, 2012, I filed an official grievance challenging Defendant
> Etchebehere's denial of my Ramadan (Iftar and Sujhoor) meals because I was
> not a participant in the R.M.A. Program.

(SAC, ECF No. 24 at 11 ¶36.)   (The copy of Plaintiff's prison appeal also shows it was

submitted on July 23, 2012.  (Id. at 27.))

### D.     Rational connection between regulation and legitimate governmental interest

Defendant argues that even if Plaintiff's rights were burdened, the 2012 Ramadan

policy was reasonably related to legitimate institutional interests:  to simplify the Ramadan

process and to reduce administrative burdens.  First, Defendant argues that it was reasonable

for Defendant to believe using the RMA diet would identify the majority of Muslim inmates in

an expedient manner because she was informed that most of SATF's Muslim inmates

participated in the RMA diet.  Second, Defendant argues that it was reasonable for her to

believe that her proposal would reduce administrative burdens for inmates and staff.  Defendant

offers the following evidence.

> I was informed that, in the years prior to my arrival, the preferred approach was
> to have the Muslim Chaplain prepare the list of the Muslim inmates who would
> participate in Ramadan. But during the planning process for Ramadan, SATF's
> Muslim Chaplain position was vacant. (I was informed that the previous Muslim
> Chaplain left SATF in 2010.) Without a Muslim Chaplain, we did not have an
> easy method to identify which inmates would be eligible to participate in
> Ramadan.

(Decl. C. Etchebehere, ¶12.)

> From March 12, 2012, until approximately late July or early August 2012, I was
> employed by CDCR as an Associate Warden at the California Substance Abuse
> Treatment Facility and State Prison – Corcoran (SATF), Complex IV.  As the
> Associate Warden of Complex IV, I oversaw two facilities, including a Level II
> Sensitive Needs Yard (SNY) and a Level II General Population (GP) Yard. I
> was also responsible for overseeing SATF's educational programs and its
> religious programs.   Normally, a Community Partnership Manager (CPM)
> would coordinate the religious programs at SATF. However, the CPM at that
> time, F. Coté, was also new to her role, having only started in May 2012.

Therefore, the primary responsibility for overseeing religious programs fell to me. Associate Wardens typically do not oversee the religious programs, because these programs are not administered by custody staff.

(Id., ¶¶2, 3, 4.)

Prior to May 2012, I had never planned for Ramadan at SATF or any other CDCR institution. Both Title 15 of the California Code of Regulations and CDCR's Department Operations Manual (DOM) provide that an institution may make variations to the two-hot-meals-per- day requirement to accommodate religious observances—which would include the observance of Ramadan for Muslim inmates. Neither the regulations nor the DOM, however, provide any guidance as to the form those variations may take. To my knowledge, there were no predefined CDCR policies concerning planning for Ramadan. Furthermore, although CDCR headquarters provided guidance on certain administrative issues relating to Ramadan (e.g., staffing issues, menu suggestions, etc.), the issue of how to identify the inmates who were eligible for Ramadan was left to each individual institution to resolve.

(Id., ¶¶15, 16, 17.)

This proposal was discussed at a June 18, 2012, meeting at SATF. The following individuals were present for the meeting: Catholic Chaplain Ojeda; acting Facility Captains Odle and Gallagher; CPM Coté; and CFM Perkins. A true and correct copy of the minutes from the June 18, 2012, meeting are attached as Exhibit B. (Ex. B at Etchebehere.004-005.) Facility Captains Odle and Gallagher did not play a major role in developing this policy: their only involvement in the meeting was to coordinate security coverage for the Ramadan accommodations. At the time we discussed this proposal, SATF was in the process of hiring a Muslim Chaplain. The new Muslim Chaplain, A. Haroun, was scheduled to start work on July 2, 2012. The plan was to use the RMA list as an initial method for identifying the Muslim inmates who would participate in Ramadan, with the understanding that Chaplain Haroun would identify any inmates who wanted to participate but were not initially identified. Chaplain Haroun was expected to immediately introduce himself to the Muslim inmates on each of the facilities, and then reconcile the RMA list with the Muslim inmate population to determine which inmates were eligible to participate in Ramadan.

(Id., ¶¶19, 20.)

After talking with the Chaplains, it was my understanding that most of SATF's Muslim inmates participated in the Religious Meat Alternate diet (RMA)—a diet program which served meat that was certified as "halal" and was designed for Muslim inmates. (Although some non-Muslim inmates also participated in the RMA diet, for various religious reasons, it was my understanding that most of the inmates on the RMA diet were Muslims. In fact, the RMA diet was often colloquially referred to as the "halal diet" by inmates and staff.) Accordingly, we proposed to use the RMA diet list as a starting point for identifying which inmates would be eligible to participate in Ramadan.

(Id., ¶18.)

///

///

Q.  Mr. Ahdom, you mentioned the RMA, can you describe what the RMA was in 2012?

A.  In Title 15, the RMA is -- the acronym, RMA, it stands for the Religious Meats Alternate Program, which is a program that's designed to accommodate individuals who take issues with the meat diets that are offered by CDCR. So, instead of receiving a regular meat item on their regular CDCR meal or lunch or dinner, they sign up for this particular program, and they will receive a meal with a meat item that has been, I don't know, identified as being a halal meat, or -- yeah a halal meat item.

(Pl.'s Dep., p. 32:14-25, ECF No. 44-2, Exh A.)

Exhibit 3 to Plaintiff's Deposition contains a copy of the official description of

the R.M.A. Program, pursuant to Cal. Code Regs. tit. 15, § 3054.3(a):

**3054.3  Religious Meat Alternate Program**.
(a)     Religious meat alternates (meat that has been certified as halal) shall be available for all institutions.  Muslim inmates may participate in the program, as determined by a Muslim Chaplain or designee Chaplain.  Non-Muslim inmates with a religious dietary need may seek participation in the program by submitting to any appropriate Chaplain a CDCR Form 3030 (Rev. 08/09), Religious Diet Request, which is incorporated by reference, for determination by the Religious Review Committee (RRC).

(Id., Ex. 3; Cal. Code Regs. tit. 15, § 3054.3(a).)

Q.  Okay. Now, I understand that the diet itself is called the RMA meal or RMA diet, but are you aware that Title 15 describes it as containing meat that is certified as halal and offered to Muslim inmates?

A.  Well, I did read the Title 15 where it says that it is -- they have it is -- the place they procure the meat from is halal certified. I believe that's to the language in there.  You say it's something else?

Q.  Let's take a look at it because I have a copy of it.

A.  Okay.

MR. WHISNAND:    I believe it's Exhibit 3, and 24 I'll ask the court reporter to attach to the record what I've pre-labeled as Exhibit No. 3, and it looks like its excerpts from Title 15.

(Whereupon Exhibit 3 is marked.)

BY MR. WHISNAND:

Q.  The part I'm talking about, Mr. Ahdom, is Section 3054.3. It's the bottom right of that first page of the exhibit.

A.  Uh-huh.

///

///

36

Q.     And it says "Religious meat alternate program. Religious meat alternate" and in parentheses it says "Meat that has been certified as halal shall be available at all institutions. Muslim inmates may participate in the program as determined by a Muslim 13 chaplain or designee chaplain."

A.     Uh-huh.

(Id., pp. 40:10-41:14.)

Q.     What does it mean for something to be halal or not halal?

A.     Well, halal is basically what is lawful for us to consume. What is lawful for us to eat. Like the word "kosher," is an -- it is a mandate, an ordinance. Pretty much the guidelines of what we can and cannot consume. It has to be lawful for us to consume. So, the actual word basically means just what's lawful.

(Id., pp. 27:22-28:6.)

The goal of the policy was to quickly and efficiently identify as many of the potential Ramadan participants as possible, in order to reduce administrative burdens. I had intended that this policy would simplify the Ramadan process for inmates, custody staff, and Food Services, as discussed below. With respect to simplifying the process for the inmates: instead of having to verify their eligibility with the Muslim Chaplain—who did not start work until July 2, 2012—inmates who were not on the RMA diet simply needed to complete a CDCR Form 3030, Religious Diet Request, and submit it to any Chaplain at the institution. (Any Chaplain could approve an inmate for the RMA diet—not just a Muslim Chaplain.) The Chaplain would then sign the form and deliver it to my secretary, who would forward it to Food Services. Under this policy, inmates would know exactly where they stood: if they were enrolled in the RMA diet, they would be eligible for Ramadan. With respect to simplifying the process for custody staff: similarly, custody staff would know exactly which inmates were eligible to participate in Ramadan. I was informed that in 2011, inmates waited until the last minute to get their names added to the Ramadan list, which caused an undue administrative burden on custody staff. (*See* Ex. B at Etchebehere.005.) Instead of having a constantly changing list, with inmates asking to be added at the last minute, the goal was to have a comprehensive list that was prepared in advance of the start of Ramadan. With respect to simplifying the process for Food Services: under this policy, Food Services only had to prepare and set aside one type of meal tray for Ramadan—the RMA meal. Although there would have been little cost difference between providing an RMA meal and a mainline meal or vegetarian meal, there would have been a burden on Food Services if they had to prepare different types of meals for Ramadan, because the meals for Ramadan were prepared apart from the regular process.

(Decl. C. Etchebehere, ¶¶22-25.)

I did not help create the 2012 Ramadan policy in order to discriminate against Plaintiff's race, his religion, or any other personal characteristic. Without a Muslim Chaplain, using the RMA list was the most expedient way of identifying the inmates who would participate in Ramadan. I do not recall discussing any other viable options with the Chaplains or CFM Perkins. There were between approximately 3,500 and 4,000 inmates across seven facilities at SATF in July

2012—without a Muslim Chaplain, any other method would have been too administratively burdensome to implement in such a short period of time.

(Id., ¶¶43-44.)

At the time we discussed this proposal, SATF was in the process of hiring a Muslim Chaplain. The new Muslim Chaplain, A. Haroun, was scheduled to start work on July 2, 2012. The plan was to use the RMA list as an initial method for identifying the Muslim inmates who would participate in Ramadan, with the understanding that Chaplain Haroun would identify any inmates who wanted to participate but were not initially identified. Chaplain Haroun was expected to immediately introduce himself to the Muslim inmates on each of the facilities, and then reconcile the RMA list with the Muslim inmate population to determine which inmates were eligible to participate in Ramadan.

(Id., ¶20.)

July 11, 2012 was also the first day that Chaplain Haroun was able to properly orient himself at SATF. That day, Chaplain Haroun met the Muslim inmates and custody staff in each of SATF's facilities. After orienting himself, Chaplain Haroun was expected to immediately assist with preparing for Ramadan. His chief assignment was to prepare the list of Muslim inmates, using the RMA list as a starting point. As of Friday evening, July 13, 2012, Chaplain Haroun was still in the process of compiling the list of Ramadan participants. I asked Chaplain Haroun to submit the final list to me by the close of business on Tuesday, July 17, 2012, which was two days before the start of Ramadan. (Chaplain Haroun worked on Tuesdays through Fridays.) A true and correct copy of an e-mail thread between myself and Chaplain Haroun discussing these issues, dated July 6, 2012, through July 13, 2012, is attached as Exhibit D. (Ex. D at Etchebehere.010-013.)

(Id., ¶29.)

**(E-mail thread referred to directly above.)**

Friday, July 6, 2012, 12:08PM
From: Haroun
To: Etchebehere

This is from A. Haroun, The new Muslim chaplain. I 'am writing to bring to your notice and to ask your permission that I would like to be here on duty from Tuesdays to Fridays. Am coming from Los Angeles and as you already know and am trying to get adjusted to the system and to learn more from you al. Thank you for the assistance and support you have given to me so far.

Friday, July 6, 2012, 1:55PM
From: Etchebehere
To: Haroun

I see you have your email. ... yeah!!! I am good with your schedule. What hours will you be working? I will make sure [redacted] has this information also.

///

Thursday, July 12, 2012, 5:31PM
From: Haroun
To: Etchebehere

Sorry for not responding to you sooner I was way too busy going around to get acquainted with the system and to get introduced to both the Muslim inmates in all 8 yards as well as to the security personnel in each yard. So I did not remember to read emails are [*sic*] were sitting in my inbox. The answer to your request is: 10 fours. i.e. 8:am to -6:00pm you said you will inform [redacted] about that too. On the other hand, after I left your office yesterday July 12 with Chaplain J- I decided to decline the request form [*sic*] the inmate who ordered the hard back books in order to keep sure that the inmates adhere strictly to the rule of law and to send strong message to them that you want your request to be approved it is simple as ABC. Play by the rules and laws you know much about. So I went to yard E and said to the inmate, look your request is not approved by me and by my superior because it is not in conformity with the law. Besides, it requires extra work and responsibility to tear off the cover, an act that in itself represent disrespect to the book. So the he should search for a soft cover and I will not hesitate to approve it. He was satisfied and glad that I came back to talk and explain this to him. This process was easy because I had not given him copy of my approval which I brought to you. I did that because I wanted to have your consent first before a copy is provided to him. So please discard the copy you have over this request and consider this file closed. Thank you very much for your genuine and friendly advice. I am grateful and proud that you are my supervisor. Am still in the learning process, so please don't leave me alone.

Friday, July 6, 2012, 12:40PM
From: Etchebehere
To: Haroun

Thank you. I don't want to be too tough but also want to protect you and the rest of our staff. I appreciate your openness!!! Don't forget about the list of Muslims for the Ramadan. If I can get that by close of Business Tuesday, it would be great!! Did you get a chance to meet with the Food Manager, D. Perkins yet? I hope so. He is the most knowledgeable about the feeding rules!!

Friday, July 13, 2012, 6:53PM
From: Haroun
To: Etchebehere

No, not at all. You are not too tough. You are too right. I am very open person and love to deal with openness. Thank you for your support and leadership. Throughout the week, I have been working on getting the final Halal diet list to you [*sic*] am almost there. I received the master list from the food service department to compare to the those I have in order to make sure the list I send to you represent those who are actually Halal eligible. The process was interrupted with the incident in C Yard which has the longest list and needed to be trimmed to its actual size. So I will do my best to address this issue first thing on Tuesday and turn in the list to you. I will work closely with the my [*sic*] Chaplain community to see how to deal with the growing list of the C yard. On the other

hand, I had a friendly phone talk with Mr. D. and what he said is, if the donor/s or the donating agency can issue documentations indicating the source of these dates, then he does not see any problem serving the dates to the Muslim inmates, provided you do the paper work to allow it in. This said, I will let you know if there is any luck in securing the dates. My initial inquiry about this issue is to know, whether or not, getting these dates to the in mates in this Month is a possibility. So with [your] response, I will go ahead and look for it and will keep you updated. Thanking you very much for everything, it is great experience having you as my boss. I am truly blessed.

(Ex. D to Decl. C. Etchebehere, ECF No. 44-5 at 21-23.)

With respect to simplifying the process for custody staff: similarly, custody staff would know exactly which inmates were eligible to participate in Ramadan. I was informed that in 2011, inmates waited until the last minute to get their names added to the Ramadan list, which caused an undue administrative burden on custody staff. (See Ex. B[37] at Etchebehere.005.) Instead of having a constantly changing list, with inmates asking to be added at the last minute, the goal was to have a comprehensive list that was prepared in advance of the start of Ramadan. With respect to simplifying the process for Food Services: under this policy, Food Services only had to prepare and set aside one type of meal tray for Ramadan—the RMA meal. Although there would have been little cost difference between providing an RMA meal and a mainline meal or vegetarian meal, there would have been a burden on Food Services if they had to prepare different types of meals for Ramadan, because the meals for Ramadan were prepared apart from the regular process.

(Decl. C. Etchebehere, ¶¶24, 25.)

## E.    **Alternative means of exercising the right**

Defendant argues that although Plaintiff did not receive Ramadan meals for six days, he was not deprived of all means of religious expression, because he received Ramadan meals on at least twenty-four of thirty days of Ramadan, he had access to various religious diets, he had access to a Muslim chaplain beginning on July 2, 2012, and he could pray, read a Quran, attend regularly-scheduled services, and possess several types of religious property. Defendant offers the following evidence.

Ramadan is an annual, month-long religious fast observed by Muslims. During Ramadan, Muslims fast from dawn to sunset, and only eat food and drink from

---

[37]   Ex. B to Etchebehere's declaration is a copy of the minutes signed by defendant Etchebehere of the Ramadan Meeting held on June 18, 2012, at SATF, which states in part, "Last year after the lists had been completed, officers were calling in at the last minute to add names to the list. Per Ms. Etchebehere, this year no one will be added after paperwork is submitted. All inmates should have their Diet Card, and that is what the list will be based on. Also, the new Muslim Chaplain will be here and he can also make the determination." (Ex. B to Decl. C. Etchebehere, ECF No. 44-5 at 15.)

sunset to sunrise.  In 2012, Ramadan was observed at SATF beginning on the evening of July 19, 2012, and ending on August 18, 2012.

(Decl. C. Etchebehere, ¶6.)

> Q.    Then, from that night, the 25th, until the end of Ramadan, were you able to go each subsequent night into the chow hall to receive your meal?
>
> A.    Yes, I was.

(Pl.'s Dep., p. 76:19-22, ECF No. 44-2, Ex. A.)

> Q.    And then on the 25th is the first evening you're able to go to Ramadan, right –
>
> A.    That's correct.

(Id., p. 86:1-3.)

> At the time we discussed this proposal, SATF was in the process of hiring a Muslim Chaplain. The new Muslim Chaplain, A. Haroun, was scheduled to start work on July 2, 2012.  The plan was to use the RMA list as an initial method for identifying the Muslim inmates who would participate in Ramadan, with the understanding that Chaplain Haroun would identify any inmates who wanted to participate but were not initially identified. Chaplain Haroun was expected to immediately introduce himself to the Muslim inmates on each of the facilities, and then reconcile the RMA list with the Muslim inmate population to determine which inmates were eligible to participate in Ramadan.

(Decl. C. Etchebehere, ¶20.)

> July 11, 2012 was also the first day that Chaplain Haroun was able to properly orient himself at SATF. That day, Chaplain Haroun met the Muslim inmates and custody staff in each of SATF's facilities. After orienting himself, Chaplain Haroun was expected to immediately assist with preparing for Ramadan. His chief assignment was to prepare the list of Muslim inmates, using the RMA list as a starting point. As of Friday evening, July 13, 2012, Chaplain Haroun was still in the process of compiling the list of Ramadan participants. I asked Chaplain Haroun to submit the final list to me by the close of business on Tuesday, July 17, 2012, which was two days before the start of Ramadan. (Chaplain Haroun worked on Tuesdays through Fridays.)  A true and correct copy of an e-mail thread between myself and Chaplain Haroun discussing these issues, dated July 6, 2012, through July 13, 2012, is attached as Exhibit D. (Ex. D at Etchebehere.010-013.)

(Id., ¶29.)[38]

///

///

---

[38] Also see the following evidence set forth hereinabove in this order at section V.C.:  (Decl. C. Etchebehere, ¶¶46, 47.); (Pl.s Resps. Def.'s RFAs Nos. 1-8 (re: religious property)); (Pl.'s Dep., p. 53:1-17.); (Pl.'s Dep., pp. 53:25-54:5.); (Pl.'s Dep., p. 67:10-21.); (Pl.'s Dep., p. 68:17-20.)

**F.** **Impact of Accommodation on guards, other inmates, and allocation of prison resources**

Defendant argues that accommodating Plaintiff's right to exercise his religious rights would have been a burden on Food Services if they had to prepare different types of meals for Ramadan. Defendant argues that proceeding without a definitive list of Ramadan participants would have placed an undue burden on custody staff because instead of focusing on maintaining the security of the dining halls, officers would have had to contend with inmates demanding to participate at the last minute, which was a documented problem in prior years. Defendant argues that this factor weighs in favor of Defendant. Defendant offers her declaration as evidence.

> With respect to simplifying the process for custody staff: similarly, custody staff would know exactly which inmates were eligible to participate in Ramadan. I was informed that in 2011, inmates waited until the last minute to get their names added to the Ramadan list, which caused an undue administrative burden on custody staff. (*See* Ex. B at Etchebehere.005.) Instead of having a constantly changing list, with inmates asking to be added at the last minute, the goal was to have a comprehensive list that was prepared in advance of the start of Ramadan. With respect to simplifying the process for Food Services: under this policy, Food Services only had to prepare and set aside one type of meal tray for Ramadan—the RMA meal. Although there would have been little cost difference between providing an RMA meal and a mainline meal or vegetarian meal, there would have been a burden on Food Services if they had to prepare different types of meals for Ramadan, because the meals for Ramadan were prepared apart from the regular process.

(Id., ¶¶24, 25.)

**G.** **Absence of ready alternatives vs. existence of obvious, easy alternatives**

Defendant argues that there were no viable alternatives to the methods she used to identify the vast majority of Muslim inmates eligible for Ramadan meals in such a short period of time. Defendant asserts that she did not have the benefit of a Muslim chaplain to help her in identifying the Muslim inmates for Ramadan, and she could not wait until the newly-hired Muslim chaplain started work. Defendant also argues that using the RMA list as a starting point was the most efficient approach that she and her staff could employ under the circumstances. Defendant argues that this factor weighs in favor of Defendant. Defendant offers the following evidence.

Beginning as early as May 2012, Chaplain Ojeda, Chaplain Guembe, Chaplain Hetebrink, Correctional Food Manager (CFM) Perkins, and I started the process of planning for Ramadan. Early on in the planning process, however, we encountered difficulties identifying the Muslim inmates who could participate in Ramadan. I was informed that, in the years prior to my arrival, the preferred approach was to have the Muslim Chaplain prepare the list of the Muslim inmates who would participate in Ramadan. But during the planning process for Ramadan, SATF's Muslim Chaplain position was vacant. (I was informed that the previous Muslim Chaplain left SATF in 2010.) Without a Muslim Chaplain, we did not have an easy method to identify which inmates would be eligible to participate in Ramadan. I do not know how SATF prepared for Ramadan without a Muslim Chaplain prior to my assignment as Associate Warden. Although SATF had scheduled interviews for the vacant Muslim Chaplain position for the end of May 2012, we could not wait until the Muslim Chaplain arrived to plan for Ramadan. Due to policy constraints, we had to start the event planning process for Ramadan no later than the middle of June 2012. A true and correct copy of an e-mail I sent to Chaplain Ojeda discussing these issues, dated May 16, 2012, is attached as Exhibit A. (Ex. A at Etchebehere.001- 003.)

(Decl. C. Etchebehere, ¶¶12-15.)

Ex. A to Decl. C. Etchebehere contains an e-mail exchange between defendant Etchebehere and Chaplain Ojeda dated May 16, 2012, as follows:

Wednesday, May 16, 2012, 10:00AM
From: Ojeda
To: Etchebehere

Attached is the Memorandum for Ramadan from last year. There are some changes that need to be made:
Dates for this hat [sic] need to be made:
- Dates for this year Ramadan begins on June 30, July 1 and ends July 30, August 1, 2012
- Review the Pre-dawn bag I need if we are to stay within the Kitchen's allowance for breakfast and lunch
- Most important, the two religious meals at the end of Ramadan need not be part of this memo if we are to conform to the freeze on all religious meals from last month.
Let me know if we need to meet to discuss these items.

Wednesday, May 16, 2012, 12:37PM
From: Etchebehere
To: Ojeda

I just spoke with headquarters and it appears that Ramadan is going to be recognized from approx July 18/19 through August 18/19. There will be a memo coming down from headquarters regarding the scheduling for the pre-dawn and after sunset feeding due to the late hour. It has been discussed with State wide Food Services also. And the directive from headquarters is that they do get a fast breaking meal celebration. Not 100% sure about the second one....will follow up on that.

///
///

Wednesday, May 16, 2012, 1:31PM
From: Ojeda
To: Etchebehere

> Do we need to meet and make changes to the memorandum I attached? Let me know.

Wednesday, May 16, 2012, 2:23PM
From: Etchebehere
To: Ojeda

> We may, but give me a few days. BTW, we are interviewing for Muslim Chaplain at the end of the month. Maybe he can take care of this. We have until the middle of June to start the event package process.

(Ex. A to Decl. C. Etchebehere, ECF No. 44-5 at 12-13.)

> The portion of the memorandum that stated there would be "no additions" to the list after the start of Ramadan was an overstatement: as was discussed at the June 18, 2012, meeting, we had intended for the Muslim Chaplain to have discretion to add additional inmates to the eligibility list if necessary. On or about July 11, 2012, I circulated the memorandum for final approval and signature by CFM Perkins, CPM Coté, the Facility Captains, the Associate Wardens, and the Warden.

(Decl. C. Etchebehere, ¶¶27, 28.)

## VII. PLAINTIFF'S MOTION TO DEEM EVIDENCE INADMISSIBLE

On April 12, 2017, Plaintiff filed a motion to deem some of Defendant's evidence inadmissible because it was altered. (ECF No. 52 at 3.) On April 19, 2017, Defendant filed a response to the motion. (ECF Nos. 54, 55.)

Plaintiff requests the court to deem inadmissible certain evidence he contends was altered by Defendant. Plaintiff questions the authenticity of Defendant's documentary evidence that the Ramadan list was updated on July 19, 2012, to include inmates who were not initially identified to participate in Ramadan, including Plaintiff. Specifically, Plaintiff challenges Defendant's explanation of why the updated list, allegedly prepared on July 19, 2012, is dated July 20, 2016. Plaintiff calls the explanation a "manufactured statement of fact." (ECF No. 52 at 4.) Plaintiff also claims that other documents dated July 20, 2016, were altered in the same way. Plaintiff asserts that contrary to Defendant's claim that the alterations were in the upper-*right* corner of each page, evidence shows that the original dates in the upper-*left* corner were completely removed and replaced with "July 20, 2016." (Id.) In another document, Plaintiff

claims that the date was removed and replaced with "WEDNESDAY, July 20, 2016." (Id. at 4-5.)

Defendant responds that she did not alter evidence, and that she and defense counsel thoroughly explained in Defendant's declaration, ECF No. 44-2 at 2-3, that the list attached to the declaration bears the wrong date-stamp due to the way Microsoft Excel processes a "[Date]" formula in one of the cells of the spreadsheet. Concurrently with her April 19, 2017, response, Defendant lodged a copy of the Excel file with the Court, ECF No. 55, and states that "[b]y simply opening the Excel File, the Court can verify that the day's date is automatically populated into the upper-right corner of the document," ECF No. 54 at 3:1-3. Defendant argues that Plaintiff's claim that the July 20, 2012, Ramadan list is a "manufactured statement of fact" lacks foundation in evidence and cannot create a genuine dispute of fact. Defendant also asserts that Plaintiff fails to explain why Defendant or defense counsel would alter the list.

**Discussion and Conclusion**

The court finds no evidence that Defendant purposely altered any the subject documents in evidence by improperly changing the date-stamp. The court is familiar with spreadsheets that automatically populate documents with the same day's date under certain circumstances. The court has opened Defendant's Excel file and observed that today's date was automatically inserted on the spreadsheet. Thus, Plaintiff's motion to deem the evidence inadmissible is denied.

## VIII. PLAINTIFF'S MOTION FOR APPOINTMENT OF EXPERT WITNESSES, MOTION FOR STAY, AND MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff brings a motion for appointment of expert witnesses, a motion for stay of the motion for summary judgment, and a motion for appointment of counsel. (ECF Nos. 28, 48, 50.)

### A.    Motion for Appointment of Expert Witnesses

The court has the discretion to appoint an expert pursuant to Rule 706(a) of the Federal Rules of Evidence. In relevant part, Rule 706 states that "[o]n a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed . .

." Fed. R. Evid. 706(a); <u>Walker v. American Home Shield Long Term Disability Plan</u>, 180 F.3d 1065, 1071 (9th Cir. 1999). Pursuant to Rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . ." Fed. R. Evid. 702. While the court has the discretion to appoint an expert and to apportion costs, including the appointment of costs to one side, Fed. R. Evid. 706; <u>Ford ex rel. Ford v. Long Beach Unified School Dist.</u>, 291 F.3d 1086, 1090 (9th Cir. 2002); <u>Walker</u>, 180 F.3d at 1071, where the cost would likely be apportioned to the government, the court should exercise caution. Moreover, Rule 706 is not a means to avoid the in forma pauperis statute and its prohibition against using public funds to pay for the expenses of witnesses, <u>Manriquez v. Huchins</u>, 2012 WL 5880431, *12 (E.D.Cal. 2012), nor does Rule 706 contemplate court appointment and compensation of an expert witness as an advocate for Plaintiff, <u>Faletogo v. Moya</u>, 2013 WL 524037, *2 (S.D.Cal. 2013).

Plaintiff requests the court to appoint a forensic computer analyst and an Islamic Scholar as expert witnesses to provide testimony in support of his opposition to Defendant's motion for summary judgment. (ECF No. 52 at 28-31.) Plaintiff contends that the expert witnesses will assist the court in deciding whether to grant or deny the motion for summary judgment.

Plaintiff contends that "Defendant has admittedly introduced altered material evidence, claiming that a computer program's '[Date]' formula is responsible for altered (removed and replaced) days and dates in several documents and e-mail memos" submitted in evidence. (<u>Id.</u> at 29.) Plaintiff asserts that "defendant's attorney offered expert testimony stating how one of the cells in the formula works, and offered to lodge a copy of a computer software file, to the Judge, to corroborate his 'expert' testimony.'" (<u>Id.</u>) Plaintiff seeks appointment of an expert forensic computer analyst to respond to Defendant's expert witness.

Plaintiff also seeks expert testimony to support his claim that Defendant substantially burdened his right to religious exercise, and to respond to Defendant's evidence that Islam

"provides fasting Muslims with an 'alternative' to the partaking of the Iftar and Suhoor at their prescribed times." (Id. at 29-30.) Plaintiff asserts that Defendant submitted a witness list for trial that included Chaplain Haroun, an Islamic scholar, as an expert witness, and Plaintiff contends that Plaintiff is required by law to offer expert testimony.

**Discussion**

While Plaintiff argues that expert witnesses would assist the court in its ruling, it is nonetheless apparent that Plaintiff seeks the appointment of experts for the purpose of submitting competing expert opinions to support his own arguments. That is not the function of a neutral expert witness. While the court is cognizant of the challenges an IFP litigant faces in retaining an expert witness, the IFP statute does not grant the court the authority to appoint expert witnesses on behalf of a party. 28 U.S.C. § 1915; See also Pedraza v. Jones, 71 F.3d 194, 196 (5th Cir. 1995).

With respect to Plaintiff's deprivation of Ramadan meals, the issue here is whether Defendant's Ramadan policy caused a violation of Plaintiff's rights under the Free Exercise Clause of the First Amendment. Plaintiff's allegations are no more complex than those found in the majority of Free Exercise cases pending before this court. The court does not require expert witnesses to determine whether Plaintiff's religious rights were violated or to explain how the computer software used by Defendant works. Plaintiff is not required by law to offer expert testimony. Therefore, Plaintiff's request for the appointment of expert witnesses shall be denied.

**B.     Motion for Stay**

Plaintiff brings a motion to stay the ruling on Defendant's motion for summary judgment to allow him time to obtain testimony from his court-appointed expert witnesses. Given the court's decision to deny Plaintiff's motion for appointment of expert witnesses, the motion for stay is moot and shall be denied as such.

**C.     Motion for Appointment of Counsel**

Plaintiff seeks the appointment of counsel to assist him with this litigation. Plaintiff does not have a constitutional right to appointed counsel in this action, Rand, 113 F.3d at 1525,

and the court cannot require an attorney to represent Plaintiff pursuant to 28 U.S.C. § 1915(e)(1). Mallard v. United States District Court for the Southern District of Iowa, 490 U.S. 296, 298 (1989). However, in certain exceptional circumstances the court may request the voluntary assistance of counsel pursuant to section 1915(e)(1). Rand, 113 F.3d at 1525.

Without a reasonable method of securing and compensating counsel, the court will seek volunteer counsel only in the most serious and exceptional cases. In determining whether "exceptional circumstances exist, the district court must evaluate both the likelihood of success of the merits [and] the ability of the [plaintiff] to articulate his claims *pro se* in light of the complexity of the legal issues involved." Id. (internal quotation marks and citations omitted).

In the present case, the court does not find the required exceptional circumstances. Defendant's motion for summary judgment has been fully briefed and is pending for the court's decision. Plaintiff argues that he suffers from diminished physical and cognitive functions due to a history of stroke and limited use of his right extremities. However, a review of the record shows that Plaintiff is responsive, adequately communicates, and is able to articulate his claims. Plaintiff's claims that he was deprived of Ramadan meals for six days, in violation of the Free Exercise clause of the First Amendment, is not complex. Therefore, Plaintiff's motion for appointment of counsel shall be denied, without prejudice.

## IX. DEFENDANT'S BURDEN

Based on the foregoing, the court finds that Defendant has met her burden of setting forth evidence that there is no genuine issue of material fact for trial, which shifts the burden to Plaintiff to submit admissible evidence showing the existence of genuine issues for trial.

## X. DISCUSSION

### A. Legal Standards

#### 1. 42 U.S.C. § 1983 – Personal Participation

The Civil Rights Act under which this action was filed provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him of rights secured by the Constitution or federal law. <u>Long v. County of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006); <u>see also</u> <u>Marsh v. Cnty. of San Diego</u>, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" <u>Preschooler II v. Clark Cnty. Sch. Bd. of Trs.</u>, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978)); "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." <u>Preschooler II</u>, 479 F.3d at 1183 (quoting <u>Johnson</u>, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." <u>Arnold v. Int'l Bus. Mach. Corp.</u>, 637 F.2d 1350, 1355 (9th Cir. 1981); <u>see also</u> <u>Harper v. City of Los Angeles</u>, 533 F.3d 1010, 1026 (9th Cir. 2008).

To prevail against a defendant under section 1983, the plaintiff must prove that the defendant either personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" <u>Hansen v. Black</u>, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).

## 2. <u>First Amendment Free Exercise Clause</u>

The Free Exercise Clause provides, "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend I. Inmates retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citing <u>Cruz v. Beto</u>, 405

U.S. 319, 322 (1972) (per curiam)).  The protections of the Free Exercise Clause are triggered when prison officials substantially burden the practice of an inmate's religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith.  Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), *overruled in part by* Shakur, 514 F.3d at 884-85.  The First Amendment is made applicable to state action by incorporation through the Fourteenth Amendment.  Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 8 (1947).

However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  Id. (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)).  "To ensure that courts afford appropriate deference to prison officials, . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  O'Lone, 382 U.S. at 349. A prison regulation may therefore impinge upon an inmate's right to exercise his religion if the regulation is "reasonably related to legitimate penological interests."  Shakur, 514 F.3d at 884.  Thus, prisons may lawfully restrict religious activities for security purposes and other legitimate penological reasons.  Turner v. Safley, 482 U.S. 78, 89–90 (1987); Pierce v. County of Orange, 526 F.3d 1190, 1209 (9th Cir. 2008).  Furthermore, the Supreme Court has held that generally-applicable laws that incidentally burden a particular religion's practices do not violate the First Amendment.  Employment Div. v. Smith, 494 U.S. 872, 878 (1990).

Claims for violation of the Free Exercise Clause of the First Amendment are used to challenge state or government statutes, regulations, and/or established policies.  Thus, in order to state a cognizable claim for their violation, a plaintiff must identify an allegedly offending statute, regulation, or established policy.  Under Turner, the court considers: (1) whether the restriction has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the rights that remain open to the inmate; (3) the impact that accommodation of the asserted constitutional right will have on other inmates, guards, and institution resources; and (4) the presence or absence of alternatives that

fully accommodate the inmate's rights at de minimis cost to valid penological interests. <u>Turner</u>, 483 U.S. at 89-91.

De minimis or minor burdens on the free exercise of religion are not of a constitutional dimension, even if the belief upon which the exercise is based is sincerely held and rooted in religious belief. <u>See</u> <u>e.g.</u>, <u>Rapier v. Harris</u>, 172 F.3d 999, 1006 n. 4 (7th Cir. 1999) (the unavailability of a non-pork tray for inmate at 3 meals out of 810 does not constitute more than a de minimis burden on inmate's free exercise of religion).

**B.**     **Sincere Belief That Religious Exercise is Consistent With Faith**

The parties do not dispute that during all times relevant to the Second Amended Complaint, Plaintiff Bilal Ahdom was a Muslim inmate who practiced Islam, and that according to Plaintiff's religious beliefs, he is required to participate in Ramadan, an annual, month-long religious fast observed by Muslims, during which Plaintiff was required to fast from sunset to sunrise, pray, read the Quran, and limit conversation.  (UF #1, 7, 8.)

**C.**     **Prison Policy and Defendant's Personal Liability**

Defendant Etchebehere argues that she is not personally responsible for Plaintiff missing more than one day of Ramadan meals because it is not her fault that Plaintiff waited until the first day of Ramadan to enroll in the RMA diet, or that his form was not submitted in time for him to be added to the Ramadan list.

As discussed above, to prevail against a defendant under section 1983, the plaintiff must prove that the defendant either personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" <u>Hansen</u>, 885 F.2d at 646.

Here, to prove that his rights under the Free Exercise Clause were violated, Plaintiff must show that a prison policy or regulation violated his rights to freely exercise his religion and was not reasonably related to legitimate penological interests.  In this case, the prison policy at issue is the plan developed by Defendant Etchebehere for the Ramadan observance in 2012 at SATF.  Pursuant to the plan, Defendant and her staff used the RMA diet list as a

starting point for identifying the Muslim inmates who were eligible to participate in Ramadan. Therefore, to state a claim against Defendant, Plaintiff must show that Defendant's plan for Ramadan caused his rights to be violated and was not reasonably related to legitimate penological interests.

**D.    Substantial Burden**

Defendant argues that it was not a substantial burden for Plaintiff to be required to sign up for the RMA diet in order to be eligible for Ramadan meals. The Ninth Circuit has recently explained:

> A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion. A substantial burden . . . places more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs. . . . To ensure that courts afford appropriate deference to prison officials, the Supreme Court has directed that alleged infringements of prisoners' free exercise rights be judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. The challenged conduct is valid if it is reasonably related to legitimate penological interests.

Jones v. Williams, 791 F.3d 1023, 1031-32 (9th Cir. 2015) (internal quotations and citations omitted). "It was well established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs." Id. at 1033.

The undisputed facts and evidence before the court show that the requirement for Plaintiff to sign up for the RMA diet to be eligible for Ramadan meals was not a substantial burden on Plaintiff's religious rights. There is no evidence that requiring Plaintiff to enroll in the RMA diet coerced Plaintiff to forego his religious beliefs or engage in conduct that violates those beliefs.

Even if the requirement caused Plaintiff to be deprived of Ramadan meals, the deprivation caused by the policy only affected the first day of Ramadan. After that, the policy changed, and other Muslims, including Plaintiff, were allowed on the list even if they had not signed up for the RMA diet. Defendant's evidence shows that Plaintiff's name was added to

the list for July 20, 2012, making him eligible to enter the dining room on that day. (ECF No. 44-5 at 81 (Ex. H)). While Plaintiff declares that a correctional officer showed him the list and his name was not on it, this is not evidence that the policy was at fault. Evidence shows that after the first day, if Plaintiff's name was not on the Ramadan list, it was for reasons other than the policy. UF #57, 58, 62. Deprivation of one day of Ramadan meals is only a de minimus burden on Plaintiff's religious rights.

Alternatively, even if the policy's requirement was a substantial burden on Plaintiff's right to practice religion, Defendant is entitled to summary judgment because the Ramadan policy was reasonably related to legitimate penological interests at SATF, as shown by analysis under the Turner factors.

### E.  **Turner Factors**

### (1)  **Whether the restriction has a logical connection to the legitimate government interests invoked to justify it**

"'In considering the first Turner factor, the court must '(1) determine whether the regulation is legitimate and neutral, and (2) assess whether there is a rational relationship between the governmental objective and the regulation.'" Boyd v. Etchebehere, 1:13-01966-LJO-SAB (PC), 2017 WL 2791660 at *11, (E.D.Cal. June 17, 2017) (citing Ashker v. California Dept. of Corrections, 350 F.3d 917, 922 (9th Cir. 2003.) "The 'orderly administration of a program that allows . . . prisons to accommodate the religious dietary needs of thousands of prisoners' is a legitimate governmental interest." Id. (quoting Resnick v. Adams, 348 F.3d 763, 769 (9th Cir. 2003)).

Here, Defendant argues that the 2012 Ramadan policy was a reasonable way to determine which of the Muslim inmates were eligible for Ramadan meals. The goal of the policy was to quickly and efficiently identify as many of the potential Ramadan participants as possible, to reduce administrative burdens and simplify the process for inmates, custody staff, and Food Services. (Decl. C. Etchebehere, ¶22.) Inmates who were not already on the RMA diet simply needed to complete a CDCR Form 3030, Religious Diet Request, and submit it to any Chaplain at the institution. (Id., ¶23.) Custody staff would know exactly which inmates

were eligible to participate in Ramadan, and Food Services only had to prepare and set aside one type of meal tray for Ramadan.  (Id., ¶¶24, 25.)  Instead of having a constantly changing list, with inmates asking to be added at the last minute, the goal was to have a comprehensive list that was prepared in advance of the start of Ramadan.  (Id., ¶24.)  The idea to start with the RMA diet list was agreed upon by Defendant after speaking with SATF's chaplains, UF #22, 25, and Defendant assumed that most of the Muslim inmates would be enrolled in the RMA diet because the diet served halal meats and was known as the halal diet.  UF #23, 26.

Plaintiff argues that Defendant's goal was to coerce him into signing up for the RMA diet and cause him to be deprived of Ramadan meals.  This argument is not supported by evidence.

In sum, the first Turner factor is satisfied in Defendant's favor.

### (2)    Whether there are alternative means of exercising the rights that remain open to the inmate

"The second Turner factor considers 'not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, . . . whether the inmates have been denied all means of religious expression.'"  Boyd, 2017 WL 2791660 at *12 (quoting  Ward v. Walsh, 1 F.3d 873, 877-78 (9th Cir. 1993) (citing O'Lone, 482 U.S. at 351-52).  "An inmate who has 'alternative means by which he can practice his religion' has not been deprived of all means of religious expression."  Id. (quoting Shakur, 514 F.3d at 886 (citing Ward, 1 F.3d at 877) (Muslim inmate who did not receive a Kosher diet not deprived of all means of religious expression where he could possess a Quran, prayer rug, and religious items, could visit an imam upon request, and could participate in various rituals and ceremonies);  Boyd v. Lehman, No. C 05-0020-JLR, 2006 WL 1442201, at *6 (W.D. Wash. May 19, 2006) (same, where Muslim inmate could not receive halal meats, but could receive a halal vegetarian diet, could attend two religious holidays per year, could participate in five daily prayers, could fast during Ramadan, and could visit a Muslim chaplain); see also O'Lone, 482 U.S. at 351-52 (same, where Muslim inmate could not attend weekly Jumu'ah prayer

///

during working hours, but could congregate for prayer when not at work, could access a Muslim imam, could eat a religious diet, and could observe Ramadan).

Defendant argues that Plaintiff had other rights available to practice his religion. Plaintiff argues that because he was not on the Ramadan list, he could not enter the dining hall to attend the Ramadan observance with fellow Muslim inmates or receive the official Ramadan meals, and because he was fasting he could not eat regular meals or take a sack lunch to his cell to eat. (SAC, ECF No. 24 ¶¶24, 26, 38; Pl.'s Affidavit, ECF No. 52, ¶9.) Plaintiff also argues that there are no alternative means of religious expression for God's command to partake of Halal foods at the prescribed times during the month of Ramadan. (Pl.'s Affidavit, ECF No. 52, ¶17.)

The question in <u>Turner</u> is not whether Plaintiff was deprived of participation in Ramadan, but whether Plaintiff was denied *all* means of religious expression. Even if Defendant's policy caused Plaintiff to miss out on several days of Ramadan, Plaintiff was still able to observe Ramadan during the remaining days of the month-long observance, and could still attend prayer sessions with fellow Muslim inmates, attend weekly Jumu'ah prayer services, use prayer rugs, and read the Quran. UF #70, 72. It is undisputed that Plaintiff could still fast for Ramadan during the day and eat food before sunrise and after sunset if he purchased food from the canteen, shared other inmates' food, or kept food in his cell. UF #12-14. Plaintiff has admitted that he was able to possess a Quran, prayer oil, prayer beads, a prayer mat/rug, a religious medallion, a Kufi cap, and a Miswak. (Pl.'s Resps. Def.'s RFAs Nos. 1-8 (re: religious property)). Therefore, Plaintiff had alternative means to practice his religion. The second <u>Turner</u> factor is satisfied in Defendant's favor.

**(3)** **<u>The impact that accommodation of the asserted constitutional right will have on other inmates, guards, and institution resources</u>**

"The third consideration is to determine the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." <u>Boyd</u>, 2017 WL 2791660 at *12 (citing <u>Turner</u>, 482 U.S. at 90). "When an accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates

or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." <u>Id.</u>

Defendant argues that without a definitive list prepared before Ramadan, custody staff would be faced with inmates waiting until the last minute to be added to the list. Defendant asserts that she was informed that this same situation in 2011 caused an undue administrative burden. (<u>Id.</u>, ¶24.) Instead of focusing on maintaining the security of the dining halls, officers would have had to contend with inmates demanding to participate at the last minute. Food Services would have been unduly burdened if inmates whose names did not appear on the list were permitted to enter the dining room for Ramadan meals. Food Services employees would not know how many Ramadan meals to prepare, and it would affect administrative costs if they overestimated the number of meals. This factor weighs in favor of Defendant.

### (4) The presence or absence of alternatives that fully accommodate the inmate's rights at de minimis cost to valid penological interests

"As to the fourth Turner factor, the Court determines whether the regulation is an 'exaggerated response' to the prison's concerns." <u>Boyd</u>, 2017 WL 2791660 at *13 (quoting <u>Turner</u>, 482 U.S. at 90-91.) "'The burden is on the prisoner challenging the regulation to show that there are obvious, easy alternatives to the regulation.'" <u>Id.</u> (quoting <u>Chau v. Young</u>, No. C 13-764 SI (PR), 2014 WL 4100635, *6 (N.D. Cal. Aug. 20, 2014) (citing O'Lone, 482 U.S. at 350)). "This determination is 'not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.'" <u>Id.</u> (quoting <u>Turner</u>, 482 U.S. at 91). "Rather, the relative inquiry is 'whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal.'" <u>Id.</u> (quoting <u>Overton v. Bazzetta</u>, 539 U.S. 126, 135-36 (2003)).

Defendant argues that there were no viable alternatives to the methods she used to identify the vast majority of Muslim inmates eligible for Ramadan meals in such a short period of time, because she did not have the benefit of a Muslim chaplain to help her, and she could not wait until the newly-hired Muslim chaplain started work. (Decl. C. Etchebehere, ¶¶12-15.)

Plaintiff argues that Defendant had many ready alternatives to using the RMA diet list for identifying Muslim inmates. Plaintiff asserts that prior to Ramadan, CDCR's policy for identifying adherents to the Islamic religion was for Chaplain Guembe to place names on a weekly list for Islamic services, special religious events, and approving religious meal applications. (Pl.'s Affidavit, ECF No. 52, ¶10.) Plaintiff argues that Defendant failed to use the already in-place policy used by resident facility chaplains. (Id. ¶¶ 22, 25.) However, Defendant was taxed with identifying Muslim inmates among more than 3,000 inmates across seven facilities, (Decl. C. Etchebehere, ECF No. 44-5, ¶44), and Plaintiff provides no evidence that the lists used by Chaplain Guembe, who was not a Muslim Chaplain, would have identified more of the Muslim inmates eligible for Ramadan meals than the policy used by Defendant, without affecting valid penological interests. Therefore, this factor weighs in favor of Defendant.

**F.    Conclusion**

Based on the foregoing analysis, the court finds that Plaintiff's rights to practice his religion were not substantially burdened because he was required, under Defendant's Ramadan plan, to enroll in the RMA diet plan to be eligible for Ramadan meals at SATF. Even if the policy caused Plaintiff to miss some of his Ramadan meals, he was still able to practice his religion in other ways. The court also finds that even if Plaintiff's rights were substantially burdened, the Ramadan plan was reasonably related to legitimate penological interests at SATF. Therefore, Defendant's motion for summary judgment should be granted.

**XI.    QUALIFIED IMMUNITY**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, --- U.S. ---, 135 S.Ct. 2042, 2044 (June 1, 2015) quoting Reichle v. Howards, 566 U. S. 658, 132 S.Ct. 2088, 2093 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia

v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009)).

The court has found that Defendant is entitled to summary judgment as a matter of law on Plaintiff's Free Exercise claim under the First Amendment. Because of this finding, it is unnecessary to reach Defendant's argument that she is entitled to summary judgment based on qualified immunity.

**XII.  MOTION TO DECLARE PLAINTIFF A VEXATIOUS LITIGANT AND REQUIRE PAYMENT OF SECURITY BEFORE THIS ACTION PROCEEDS**

In the alternative to summary judgment, Defendant requests that even if the court finds that a disputed issue of material fact precludes summary judgment, the court should issue an order, pursuant to Local Rule 151(b), requiring Plaintiff to post $2,550.00 in security before this action proceeds, on the grounds that (1) Plaintiff has maintained at least nine unsuccessful suits as a pro se litigant over the past seven years; and (2) there is no reasonable probability that he will prevail at trial.

Given that the court has found that Defendant is entitled to summary judgment, it is unnecessary to consider Defendant's motion to declare Plaintiff a vexatious litigant and require payment of security. Thus, this motion is moot.[39]

**XIII.  CONCLUSION AND RECOMMENDATIONS**

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.  In the event that there is any confusion about whether Plaintiff's claims under the Eighth and Fourteenth Amendments were previously dismissed, it is recommended that they be dismissed by this order;

2.  Plaintiff's motion to deem evidence inadmissible be DENIED;

3.  Plaintiff's motion for the appointment of expert witnesses be DENIED;

4.  Plaintiff's motion for stay to allow further discovery be DENIED;

5.  Plaintiff's motion for the appointment of counsel be DENIED;

---

[39] Defendant's related request for judicial notice is also moot. (ECF No. 44-1.)

6.      Defendant's motion for summary judgment, filed on January 20, 2017, be GRANTED;

7.      Defendant's motion for qualified immunity be DENIED as moot;

8.      Defendant's motion to declare Plaintiff a vexatious litigant and require payment of security be DENIED as moot; and

9.      Defendant's request for judicial notice be DENIED as moot.

These Findings and Recommendations will be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **fourteen (14) days** after the date of service of these Findings and Recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within **seven (7) days** of the date the objections are filed. The parties are advised that failure to file objections within the specified time may waive the right to appeal the order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**August 20, 2017**__              _____ **/s/ Gary S. Austin**
                                                          UNITED STATES MAGISTRATE JUDGE